FILED
01-15-2026
Anna Maria Hodges
Clerk of Circuit Court
2026CV000361
Honorable Reyna Morales-42
Branch 42

**VERONA SWANIGAN, ESQ.**

**WSBN: 1086459**

**THE SWANIGAN FIRM**

**425 W. CAPITOL AVE STE 1533**

**LITTLE ROCK, AR 72201**

**866-603-5239**

**callthelawlady@outlook.com**

**CORDAY ALEXANDER LINTON**

---

**STATE OF WISCONSIN          MILWAUKEE COUNTY      CIRCUIT COURT**

| | |
|---|---|
| **CORDAY ALEXANDER LINTON,** | Case No._____ |
| **Plaintiff,** | |
| | **COMPLAINT** |
| **v.** | **JURY TRIAL DEMANDED** |
| **CITY OF MILWAUKEE; BENJAMIN SANCHEZ, in his individual and official capacities;** | |
| **MATTHEW REJC, BRIAN PELLETT, TIMOTHY ASKIN, AARON HELT, LISA MANEY, and TODD MILLER, each in their individual and official capacities,** | |

4

**Defendants.**

## I.    INTRODUCTION

1.    This civil rights action arises from a pattern of racial discrimination, fraudulent document practices, and procedural violations committed by officials of the City of Milwaukee in the administration of federally funded housing programs. Acting under color of state law, Defendants deprived Plaintiff, an African-American developer, of equal protection, due process, and fair participation in federal housing initiatives intended to promote community revitalization and affordable housing opportunities.

2.    Plaintiff CORDAY ALEXANDER LINTON seeks redress for injuries sustained when City officials deliberately obstructed his HUD-funded housing-rehabilitation project through unauthorized contract alterations, falsified cost documentation, racially charged statements, and the wrongful withholding of federal and other contractually-obligated funds totaling $95,521 ($29,998 in federal HOME funds and $65,523 in DCD Commercial Corridor funds). These actions destroyed a viable affordable-housing development and inflicted lasting economic and reputational harm.

3.    The Defendants' conduct—spanning multiple City departments and coordinated administrative actions—reflects a systematic enterprise of racial bias and fraudulent program administration. The acts included:

(a) forging official rehabilitation agreements to inflate costs by more than 60%;

(b) imposing unlawful "historic preservation" requirements without legal authority or Section 106 review;

(c) fabricating false "fraud" accusations against Plaintiff to justify withholding funds; and

 (d) issuing contradictory code-enforcement citations designed to increase expenses and cause project failure.

4.     When confronted with evidence disproving these accusations, Defendant Benjamin Sanchez, the City's Housing Rehabilitation Manager, revealed the true motive behind the obstruction by stating that Plaintiff "didn't deserve the money because people like you don't deserve the money," clarifying that he meant "both Black people and people from the north side of Milwaukee."

5.     These statements and actions constitute direct evidence of intentional racial discrimination in violation of the Fourteenth Amendment, Title VI of the Civil Rights Act of 1964, Section 109 of the Housing and Community Development Act, and the Fair Housing Act. The City's institutional failure to investigate or correct these violations further establishes municipal liability under Monell v. Department of Social Services, 436 U.S. 658 (1978).

6.     Plaintiff seeks compensatory and punitive damages, declaratory and injunctive relief, and attorney's fees under 42 U.S.C. § 1988, together with any other relief necessary to remedy the continuing effects of Defendants' discrimination and fraudulent administration of federal housing programs.

## II.      JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983, Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d et seq.), Section 109 of the Housing and Community Development Act of 1974 (42 U.S.C. § 5309), and the Fair Housing Act (42 U.S.C. § 3601 et seq.).

8.     This Court also has jurisdiction under 28 U.S.C. § 1343(a)(3)–(4), which grants jurisdiction over actions to redress deprivations of civil rights under color of state law.

9.     This Court has supplemental jurisdiction over Plaintiff's related state-law claims—including breach of contract, conversion, and public-records violations—under 28 U.S.C. § 1367(a) because those claims arise from the same nucleus of operative facts as the federal causes of action.

10.     Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events, omissions, and injuries giving rise to this action occurred within the City of Milwaukee, Wisconsin, which lies in the Eastern District of Wisconsin.

11.     Defendant City of Milwaukee is a political subdivision of the State of Wisconsin that receives and administers federal funds from the U.S. Department of Housing and Urban Development ("HUD") under programs including the Community Development Block Grant (CDBG) and HOME Investment Partnerships programs.

12.     All individual defendants were employed by or acting on behalf of the City at the time of the events alleged, and each acted under color of state law within the meaning of 42 U.S.C. § 1983.

13.     Plaintiff satisfied all pre-suit notice requirements applicable under Wis. Stat. § 893.80 by serving written notice of claim upon the City of Milwaukee on March 16, 2025, more than 120 days before the filing of this action (Exhibit O). The City's response acknowledged receipt but failed to undertake any substantive investigation into the documented civil rights violations.

### III. PARTIES

**A.     Plaintiff**

14.     Corday Alexander Linton ("Plaintiff") is an African American businessman and real estate developer. He resides in California and formerly resided and conducted business in Milwaukee, Wisconsin.

15.     Plaintiff purchased property at 5128–5130 West Center Street, Milwaukee, Wisconsin, from the City of Milwaukee in 2019 to develop affordable housing and community- serving businesses in the neighborhood where he was raised.

16.     Plaintiff is the intended beneficiary of federally funded housing and community development programs administered by the City of Milwaukee, including the HOME Investment Partnerships Program and Community Development Block Grant (CDBG) programs.

**B.     Defendants**

17.     City of Milwaukee ("City") is a Wisconsin municipal corporation and a designated recipient of substantial federal financial assistance from the U.S. Department of Housing and Urban Development ("HUD"), including CDBG Grant No. B-20-MC-55-0017 and HOME Grant No. M-20-MC-55-0213.

18.     The City is responsible for ensuring that its departments and agents administer federally funded housing programs in compliance with Title VI of the Civil Rights Act of 1964, the Fair

Housing Act, Section 109 of the Housing and Community Development Act, and related federal regulations.

19.    Benjamin Sanchez is sued in his individual and official capacities as Housing Rehabilitation Manager for the Neighborhood Improvement Development Corporation ("NIDC"), a division of the City's Department of City Development ("DCD"). Sanchez exercised supervisory and administrative authority over Plaintiff's federally funded rehabilitation contracts and made explicit racist statements to Plaintiff while withholding program funds on pretextual grounds.

20.    Brian Pellett is sued in his individual and official capacities as former NIDC Rehabilitation Specialist. Pellett participated in creating and distributing forged "Owner Development Agreements" with inflated costs that were used to justify denial of federal reimbursements owed to Plaintiff.

21.    Matthew Rejc is sued in his individual and official capacities as Neighborhood Business Development Administrator for the Department of City Development. Rejc coordinated with other City officials to perpetuate false narratives and knowingly relied on fraudulent documentation to obstruct Plaintiff's project.

22.    Timothy Askin is sued in his individual and official capacities as Historic Preservation Commission Staff Member. Askin imposed unauthorized and costly "historic preservation" requirements on Plaintiff's project without complying with Section 106 consultation procedures or Milwaukee Code § 320-21, causing substantial project delays and expense.

23.    Aaron Helt is sued in his individual and official capacities as NIDC Program Manager with supervisory authority over federally funded programs. Helt participated in or failed to

prevent secret administrative reviews and other actions that used falsified documents to block disbursement of federal funds.

24.     Lisa Maney is sued in her individual and official capacities as Commercial Code Inspector for the Department of Neighborhood Services ("DNS"). Maney weaponized code enforcement by issuing violations inconsistent with approved plans, targeting conditions predating Plaintiff's ownership, and concealing those violations from public records, all in furtherance of the discriminatory scheme.

25.     Todd Miller is sued in his individual and official capacities as Community Outreach Liaison in the Office of the Mayor of Milwaukee. After receiving Plaintiff's documented civil-rights complaints and proof of discrimination, Miller ratified the misconduct by referring the complaints back to the offending officials instead of initiating an independent investigation.

C.     **Residency and Address Allegations**

26. Upon information and belief, Defendants Benjamin Sanchez, 809 North Broadway, 3rd Floor, Milwaukee, WI 53202, Matthew Rejc 809 N. Broadway Room 104 Milwaukee, WI 53202, Timothy Askin 200 E. Wells Street Milwaukee, WI 53202, Lisa Maney 841 N. Broadway, Room 104, Milwaukee, WI 53202, and Todd Miller 200 E. Wells Street Milwaukee, WI 53202, are current employees of the City of Milwaukee and have been residents of the City of Milwaukee or the State of Wisconsin for more than one year preceding the filing of this action.

27.    Upon information and belief, Defendant Brian Pellett is a former employee of the City of Milwaukee and resides at 1713 E Morgan Ave, Milwaukee, WI 53202. He has been a resident of the State of Wisconsin for more than one year preceding the filing of this action.

28.    Upon information and belief, Defendant Aaron Helt is a former employee of the City of Milwaukee and resides at 1020 W River Pkwy, Champlin, MN 55316. He has been a resident of the State of Minnesota for more than one year preceding the filing of this action.

29.    Defendant City of Milwaukee is a Wisconsin municipal corporation and shall be served at its principal executive office:

   City of Milwaukee – Office of the Mayor

   200 E. Wells Street

   Milwaukee, WI 53202

30.    For purposes of municipal liability, the "City of Milwaukee" includes the Office of the Mayor, Department of City Development (DCD), Neighborhood Improvement Development Corporation (NIDC), Department of Neighborhood Services (DNS), the Historic Preservation Commission, and all subordinate departments and officials acting under color of state law.

**D.    Agency and Color of Law**

31.    At all times relevant, each Defendant acted under color of state law, within the scope of official duties or apparent authority, and pursuant to City customs, policies, and practices. The actions, omissions, and policies described herein were undertaken with deliberate indifference to Plaintiff's federally protected rights and caused the injuries alleged.

### IV. FACTUAL ALLEGATIONS

**A.      The Development Project and Funding Structure**

32.      In 2019, Plaintiff purchased property at 5128-5130 W. Center Street from the City of Milwaukee for $10,000 to create affordable housing and businesses in the neighborhood where he was raised.

33.      The building was constructed in 1927 and had been owned by the City for 11 years prior to Plaintiff's purchase.

34.      Plaintiff secured comprehensive financing totaling over $311,000 through two separate but connected contracts with the City. 21

35.      The Residential Contract provided $29,998 from NIDC's federally-funded Rental Rehabilitation Program (HOME Investment Partnership Program Grant M-20-MC-55-0213) for rehabilitation of two apartments, with an original total project budget of $114,900.

36.      The Commercial Contract (Exhibit A) provided $65,523 from DCD's Commercial Foreclosed Property Fund for business development, with an original total project budget of $196,570.

37.      Plaintiff coordinated with city officials throughout the project development process. In February 2020, the Department of City Development issued formal approval letters establishing legitimate project parameters with standard commercial rehabilitation requirements and no historic preservation components (Exhibit A).

38.      Architect Nicholas Robinson had previously submitted drawings to the plan check process in December 2019.

39.     The plan check drawings were approved without any notation of historic designation, historic district inclusion, special preservation requirements, or property code violations (Exhibit A).

40.     The plan check process is specifically designed to identify all regulatory requirements including historic considerations and existing code violations. No such designations or violations were found.

41.     The NIDC contract established progressive disbursement procedures under Section 4(c), 4(d), and 4(e).

42.     Section 4(e) of the NIDC contract specifically mandated that "within five (5) days after the inspection of the work, the Lender shall issue its authorization for distribution to the Borrower" unless quality standards are not met (Exhibit B). The construction manager executed disbursement statements confirming completed work eligible for reimbursement under the contract terms (Exhibit E).

**B.     Benjamin Sanchez's Explicit Racist Statements**

43.     In approximately September 2022, during a conference call with Plaintiff, construction manager Michael Amrhein, and assistant Sherri Underwood, Defendant Sanchez began making false fraud accusations against Plaintiff.

44.     Sanchez claimed Plaintiff had submitted "fraud by asking for reimbursement from Rick Banks and Brian Pellet for the same scope items" and was "attempting to obtain double reimbursement" and "double dipping" by allegedly submitting duplicate requests for identical work items.

45. Defendant Sanchez made these accusations despite knowing they were false. Sanchez's own August 18, 2022 email acknowledged that "Rick Banks is no longer employed with the City of Milwaukee" (Exhibit C-1).

46. Rick Banks had served as Plaintiff's DCD contact for the commercial portion of the project. Because Banks was no longer employed by the City during the relevant period, Sanchez knew that any duplicate submissions to Banks were logically impossible.

47. On November 14, 2022, when Plaintiff questioned why his funding was being stalled, Defendant Sanchez repeated his false "double dipping" accusations during a phone conversation, again claiming Plaintiff was "requesting reimbursement from two programs for the same expenses."

48. These false fraud accusations were used as pretextual justifications to launch an investigation and withhold Plaintiff's contractually-obligated funds while violating CDBG program requirements.

49. The accusations were made publicly to third parties, causing substantial harm to Plaintiff's credibility and standing in the community.

50. On November 17, 2022, Plaintiff refuted these accusations by providing documented proof that all correspondence with Banks concerned only grant extensions and reporting requirements—not duplicate reimbursement requests (Exhibit N). When confronted with this evidence, Defendant Sanchez abandoned his fabricated narrative and escalated to explicit racial discrimination.

51.    When the false justifications failed, Sanchez revealed his true discriminatory motive by directly stating that Plaintiff "didn't deserve the money because people like you don't deserve the money."

52.    When Plaintiff asked for clarification whether Sanchez meant "Black people or people from the north side of Milwaukee," Defendant Sanchez explicitly responded "both," confirming his personal racial and geographic discrimination against Plaintiff.

53.    This progression from knowingly false fraud accusations to explicit racist statements when the pretexts were disproven demonstrates the classic discrimination pattern recognized by federal courts, where officials create pretextual justifications to mask discriminatory intent, then reveal their true motives when the false justifications are exposed.

54.    Defendant Sanchez systematically withheld $29,998 in federal HOME funds using both the forged documents created by defendant Pellett and his own false fraud accusations as coordinated pretextual justifications for his racially motivated conduct, while violating CDBG program requirements mandating progressive disbursement procedures.

**C.    Brian Pellett's Sophisticated Document Forgery Scheme**

55.    Defendant Pellett orchestrated a document forgery scheme, creating fraudulent "Owner Development Agreements" that inflated legitimate construction costs from $114,900 to $191,025—a 66% artificial increase designed to justify fund withholding.

56.    On April 5, 2022, construction manager Michael Amrhein received these forged documents from Defendant Pellett.

57.     Amrhein immediately emailed Plaintiff stating: "Brian Pellet has delivered this contract for my review (I do not recall seeing this before). He is requesting that he be given a signed copy before releasing any funds" (Exhibit F).

58.     Amrhein's immediate documentation proves Pellett knew he was distributing fabricated documents.

59.     Defendant Pellett knew these documents were fraudulent because: (a) the $191,025 cost figure had no basis in actual construction estimates; (b) the document format differed from all previous legitimate agreements; (c) no legitimate contracting process had produced such documents; and (d) Pellett himself had participated in creating the original $114,900 budget, making the 66% inflation obviously artificial.

60.     Defendant Pellett coerced Plaintiff into signing the fraudulent documents by making signature a condition for receiving any reimbursement funds.

61.     The coerced signature artificially raised the Project Loan Threshold from the legitimate $84,902 to $161,027.

62.     This violated CDBG documentation requirements that mandate all invoices be on company letterhead with detailed cost breakdowns and reflect only "allowable costs and activities" as outlined in contracts.

63.     On March 22, 2025, Michael J. A. Amrhein executed a notarized statement under penalty of perjury confirming the fraudulent nature of documents delivered by defendant Pellett (Exhibit G).

64.     The fraudulent nature of these documents was not discovered by Plaintiff until professional forensic analysis was conducted by an IT specialist in May 2024, who organized all

emails and documents chronologically in an Excel database, enabling comprehensive document analysis for the first time (Exhibit S – Forensic Analysis Timeline).

65.     Defendant Sanchez then weaponized these forged documents to justify additional requirements, including asset reconfirmation and submission to secret administrative review committees.

**D.     Timothy Askin's Unauthorized Historic Requirements**

66.     Despite the 1927 building not being subject to historic preservation requirements and no historic designation appearing in approved plan drawings, defendant Askin imposed unauthorized historic requirements in September 2020 without following required procedures.

67.     The building's 1927 construction date places it within a time frame that could potentially trigger historic preservation requirements, making the failure to follow proper Section 106 consultation procedures a significant federal violation.

68.     Prior to imposing unauthorized requirements, defendants coordinated through direct referrals.

69.     Construction manager Michael Amrhein reported that "I spoke with Brian Pellet Milwaukee NIDC who referred me to Historic Preservation Commission (HPC) regarding required window specifications" (Exhibit D-5).

70.     On September 24, 2020, following this coordination, Defendant Askin imposed specific window requirements—including "muntins" and specialized materials—that significantly increased costs beyond the approved project scope.

71.     These requirements were communicated to construction manager Michael Amrhein and documented in Project Notes PN-1 (Exhibits D, D-2).

72.     Defendant Pellett later relied on and reinforced these unauthorized requirements as part of the coordinated obstruction scheme.

73.     These unauthorized requirements violated federal Section 106 consultation procedures required for CDBG-funded projects, as defendant Askin failed to follow proper environmental review procedures mandated by 24 CFR Part 58.

74.     The requirements also violated Milwaukee Municipal Code § 320-21, which requires written documentation and formal procedures for any historic preservation determinations, none of which were provided.

75.     The cost impact of these unauthorized requirements is evidenced by the dramatic increase from the original $5,000 window cost in the Peoples Contracting bid (Exhibit D-1) to the actual specialized window costs necessitated by Askin's requirements.

76.     Defendant Askin's historic requirements constituted fraudulent misrepresentation because:

        (a) Askin falsely told Plaintiff the requirements were mandatory when no binding historic designation existed;

        (b) Askin knew Milwaukee Code § 320-21 (2023) required written documentation for historic determinations, which he failed to provide;

        (c) Askin intended to inflate project costs and delay completion; and

        (d) Plaintiff relied on these false requirements by expending additional funds on specialized windows and materials, causing damages exceeding $15,000 in unnecessary costs.

77.    The project delays caused by these requirements necessitated grant extensions, as documented in Plaintiff's Extension Request citing window difficulties (Exhibit D-3) and the City's acknowledgment of window-related delays (Exhibit D-4).

**E.    Ben Sanchez's Use of Forged Documents and Creation of False Administrative Barriers**

78.    On August 30, 2022, Defendant Sanchez explicitly confirmed the federal nexus and foreshadowed his discriminatory scheme in an internal email.

79.    Sanchez stated: "Please remember that the NIDC Rental Rehab loan was funded and reserved under HOME federal dollars… Thank you for your patience as I developed the narrative associated with the invoices received to date" (Exhibit C).

80.    This "narrative development" confession demonstrates defendants' coordination in creating false justifications for discriminatory treatment while violating CDBG program requirements that mandate factual documentation and proper administrative procedures.

81.    Consistent with the asset-verification demand he foreshadowed in his August 30, 2022 "narrative" email, on November 10, 2022 Defendant Sanchez sent an email demanding additional asset verification that was not required under the original contracts and violated CDBG program requirements for progressive disbursement (Exhibit H).

82.    Sanchez stated: "We would like to request asset verifications to confirm the shortage of funds from $150,000 NWSCDC, $29,998 NIDC and $65,523 Commercial Corridor funds. Please provide documentation supporting how the gap in project cost is being closed. We will need to document this and present this change and asset verification before our Administrative Review Committee to reconcile the budget established with our DCD accounting team."

83.     These asset verification requests were directly connected to the forged documents and violated CDBG program requirements.

84.     The "shortage of funds" cited by Sanchez was artificially created through Defendants' own document forgery, which inflated costs from $114,900 to $191,025. This circular fraud— manufacturing a crisis to justify fund withholding—violated federal disbursement requirements under 2 C.F.R. § 200.305(b)(1) and (b)(3), and the contractual 5-day disbursement requirement under Section 4(e).

85.     The scheme constituted systematic deception: (a) Sanchez knew the "shortage" was artificially created through Pellett's forgery; (b) no CDBG policy required asset verification for city-imposed cost increases; (c) Sanchez admitted to "developing the narrative" rather than following procedures; and (d) the Administrative Review Committee was created to obstruct funding, not provide legitimate oversight. Despite signed disbursement statements confirming completed work (Exhibit E), Defendants systematically ignored these verified requests.

86.     On November 17, 2022, Defendant Sanchez further confirmed the secret administrative proceedings, stating: "Our Administrative Review Committee is waiting on one last key piece of information from our Community Development Grant Administration (CDGA) office to make a determination associated with your Rental Rehab reimbursement request" (Exhibit I).

87.     On November 30, 2022, Defendant Sanchez sent an email (Exhibit J) that demonstrates the sophisticated coercion scheme using fraudulent documents while violating CDBG program procedures.

88.     Sanchez falsely characterized Plaintiff's legitimate contractual disbursement requests as an "exception to our policy and release NIDC loan funds prior to all other funds being

exhausted," creating false administrative barriers not supported by CDBG program requirements.

89.     No such "policy" existed in any written contract, program guideline, or federal regulation, constituting creation of false administrative barriers that violated CDBG requirements mandating progressive disbursement procedures and proper financial management documentation.

90.     Sanchez referenced "the contract established between you and BGI Construction Management"—this was the forged Owner Development Agreement that defendant Pellett had created and forced Plaintiff to sign.

91.     Sanchez stated "NIDC will require completing a change order to extend your rehabilitation contract, and address the increase in total rehab costs"—these cost increases were caused by defendants' own unauthorized historic requirements and forged documents, while violating CDBG requirements that eligible costs be incurred and requested as outlined in grant contracts.

92.     This email demonstrates how defendants used the forged documents to trap Plaintiff in an impossible financial situation while maintaining the pretense of following legitimate administrative procedures and violating federal CDBG program management requirements.

**F.      Lisa Maney's Discriminatory Code Enforcement**

93.     Defendant Maney weaponized code enforcement to support the discriminatory scheme by issuing violations that contradicted approved plan drawings and addressed conditions that existed during the City's 11-year ownership of the property.

94.     On March 23, 2022, Defendant Maney issued code violations requiring Plaintiff to "scrape and paint wood surfaces on exterior storefront" (Exhibit M).

95.     Complete storefront replacement had been formally approved by the Department of City Development.

96.     Complete storefront replacement had been cleared through plan check review.

97.     Complete storefront replacement was incorporated into the agreed-upon scope of work for both the Residential and Commercial Rehabilitation Agreements.

98.     Defendant Maney's directive to scrape and paint the storefront was incompatible with the approved scope requiring complete storefront replacement.

99.     This directive conflicted with project scope and introduced costs not eligible under federal rehabilitation standards.

100.    By imposing directives outside the approved rehabilitation scope, Defendant Maney and the City violated: (a) 24 C.F.R. § 570.501(b) (recipient responsibility for ensuring CDBG funds are used in accordance with program requirements, which cannot be delegated to other municipal agencies); (b) 2 C.F.R. § 200.303 (failure to maintain effective internal controls over federal awards); and (c) 24 C.F.R. § 570.207(a) (creating ineligible costs through conflicting directives).

101.    Defendant Maney's actions further obstructed Section 3 compliance by creating unnecessary, non-scope work that increased costs and delayed completion, thereby reducing opportunities for low-income workers and contractors, in violation of 24 C.F.R. § 570.607(b).

102.    The violations addressed long-standing conditions that existed during the City's 11-year ownership of the property, but were imposed only during active federal rehabilitation,

demonstrating deliberate obstruction contrary to 2 C.F.R. §§ 200.303, 200.403–405 (internal controls; allowability, allocability, and reasonableness of costs).

103.    Comprehensive searches of the City of Milwaukee's public property database reveal no record of Defendant Maney's March 23, 2022 code violations, despite their documentation in Plaintiff's email correspondence and their enforcement against Plaintiff's federally-funded project (Exhibit M).

104.    This systematic exclusion from public records violates Wisconsin Statute § 19.35(1)(a)'s presumption of public access and federal CDBG transparency requirements under 24 C.F.R. § 570.506 (entitlement recordkeeping requirements) and 2 C.F.R. § 200.334 (retention requirements for records), demonstrating deliberate concealment of discriminatory enforcement actions.

105.    When Plaintiff inquired about the possibility of fine removal following proper administrative procedures, Defendant Maney categorically stated that "the fines will not be removed," demonstrating predetermined bias and failure to follow proper administrative appeal procedures required under Milwaukee Municipal Code and federal CDBG program administration requirements.

106.    These enforcement actions were coordinated with the document forgery scheme and unauthorized historic requirements to create maximum financial burden on Plaintiff.

107.    Defendant Maney's code violations, as described in paragraphs 97-101 above, specifically targeted the commercial storefront component of Plaintiff's project.

108.    Defendant Maney's directive introduced costs not contemplated in the Commercial Corridor Agreement (Exhibit A).

109.    At the time Defendant Maney issued her directive, the City was withholding $65,523 in Commercial Corridor funds.

110.    At the time Defendant Maney issued her directive, the City was withholding $29,998 in residential reimbursements.

111.    The withheld residential reimbursements would have replenished Plaintiff's capital for continued construction toward commercial milestones.

**G.     Todd Miller's Ratification and Municipal Silence**

112.    On December 14, 2022, Plaintiff escalated documented evidence of discrimination to Defendant Miller in the Mayor's office (Exhibit N). Despite receiving proof refuting the false fraud accusations and identifying specific discriminatory conduct, Miller failed to investigate.

113.    Instead, Miller referred the complaint back to the offending officials, stating he was "hoping NIDC staff will address your request in due time" (Exhibit N).

114.    This executive ratification—directing civil rights complaints to the perpetrating officials rather than conducting independent investigation—demonstrates municipal policy approval of constitutional violations under Monell v. Department of Social Services, 436 U.S. 658 (1978).

**H.     Inspector General Deliberate Indifference and Federal Regulatory Violations**

115.    On July 19, 2024,Plaintiff filed a comprehensive fraud report with the Milwaukee Inspector General alleging "cash kickbacks, bribes, extortion, forgery," "false statements, certification, etc.," and "conflicts of interest, ethics violation" involving the same named City employees identified in this complaint: Rick Banks, Aaron Helt, Ben Sanchez, Matthew Rejc, and Lisa Maney (Exhibit U).

116.    Defendants, as recipients and administrators of federal CDBG and HOME funds, had an affirmative duty under 2 C.F.R. § 200.113 to disclose in writing to HUD all violations of federal criminal law involving fraud that potentially affected Plaintiff's federally-funded project.

117.    Despite receiving detailed allegations of fraudulent conduct through the Inspector General complaint (Exhibit U), including forged cost estimates and deliberate misrepresentations by City officials, no disclosure was made to HUD, HUD OIG, or other required recipients.

118.    This violation demonstrates municipal ratification of misconduct and places the City in direct violation of federal grant compliance requirements, exposing it to sanctions including repayment of funds, suspension, or debarment.

119.    The Milwaukee Inspector General's complete non-response to Plaintiff's detailed fraud report (Exhibit U) demonstrates a direct violation of 24 C.F.R. § 570.506 (entitlement recordkeeping requirements), 24 C.F.R. § 570.501(b) (recipient responsibility for program compliance), and 2 C.F.R. § 200.113 (mandatory disclosure requirements), which require municipal recipients of federal funds to maintain complete records and take corrective action regarding compliance issues.

120.    The City's systematic failure to investigate credible evidence of fraud involving federal housing programs constitutes not only ratification of employee misconduct but also noncompliance with federal oversight obligations, exposing the City to potential HUD sanctions, repayment demands, and loss of future funding.

121.    The Inspector General's silence, combined with the City's failure to respond to civil rights complaints and systematic non-disclosure of federal program violations, establishes a

pervasive municipal custom of deliberate indifference to constitutional violations under *Monell* doctrine.

122.    This pattern spans all oversight mechanisms—from individual supervisors to executive leadership to independent oversight bodies—demonstrating institutional policy approval of discriminatory conduct rather than isolated employee misconduct.

**I.    Discovery of the Coordinated Discriminatory Scheme**

123.    Beginning in May 2020, Defendants formed a coordinated enterprise to obstruct Plaintiff's project: (a) Askin imposed unauthorized historic requirements breaching both contracts; (b) Pellett orchestrated document forgery; (c) Maney weaponized code enforcement; and (d) Sanchez coordinated fund withholding while "developing the narrative."

124.    The coordinated nature of this scheme was not discoverable until May 2024, when professional forensic analysis organized all emails and documents chronologically, revealing timing patterns and systematic concealment that appeared routine when viewed in isolation but demonstrated precise coordination when analyzed comprehensively (Exhibit S – Forensic Analysis Timeline).

125.    The conspiracy is evidenced by:

(a) coordinated timing between Askin's unauthorized requirements (September 2020), Pellett's document forgery (2022), and Sanchez's fund withholding (2022–2024);

(b) Sanchez's explicit admission to "developing the narrative" for collective use;

(c) shared use of forged documents across departments;

(d) systematic deviation from standard procedures by all defendants; and (e) common purpose of preventing Plaintiff from receiving promised federal funds while maintaining appearance of legitimate administration.

126.    The sophisticated coordination between Sanchez's August 2022 "narrative development" confession and his November asset verification requests demonstrates that the Administrative Review Committee proceedings were part of the coordinated discriminatory scheme.

127.    Sanchez's narrative was specifically developed for this committee, while his November requests referenced the same committee and fabricated "shortage of funds" created through Pellett's document forgery, proving the asset verification was designed to obstruct Plaintiff's funding rather than provide legitimate administrative oversight.

**J.    The Interdependence of Funding Streams and Sequential Obstruction**

128.    The Residential Rehabilitation Agreement required the City to disburse $29,998 in HOME funds progressively upon verified completion of work phases. The Commercial Corridor Agreement (Exhibit A) Plaintiff to reach commercial rehabilitation milestones before triggering release of $65,523 in commercial funds.

129.    Defendant Askin imposed historic preservation requirements in September 2020 that increased project costs beyond the original approved scope of $114,900 (Exhibits D, D-2, D-5).

130.    Defendant Pellett delivered to construction manager Michael Amrhein a document titled "Owner Development Agreement" that increased the residential rehabilitation budget from $114,900 to $191,025 (Exhibit F). On April 5, 2022, Amrhein documented in writing: "Brian Pellet has delivered this contract for my review (I do not recall seeing this before)" (Exhibit F). On March 22, 2025, Amrhein executed a notarized statement confirming that he had never seen

this document before and that it did not reflect any agreement authorized by Plaintiff or BGI Construction Management (Exhibit G).

131.    On March 23, 2022, Defendant Maney issued code violations requiring Plaintiff to "scrape and paint wood surfaces on exterior storefront" (Exhibit M). The DCD-approved plans and plan-check drawings specified complete storefront replacement, not scraping and painting (Exhibit A).

132.    Plaintiff expended personal capital to address the increased costs and submitted reimbursement requests supported by verified inspections and proper documentation (Exhibits E, K-1).

133.    On August 30, 2022, Defendant Sanchez sent an internal email stating: "Thank you for your patience as I developed the narrative associated with the invoices received to date" (Exhibit C).

134.    On November 10, 2022, Defendant Sanchez sent an email demanding that Plaintiff "provide documentation supporting how the gap in project cost is being closed" (Exhibit H). The cost figure referenced by Sanchez—$191,025—appears in the document delivered by Defendant Pellett, not in the original Residential Rehabilitation Agreement, which specified $114,900.

135.    Asset verification was not required under the Residential Rehabilitation Agreement (Exhibit B). Asset verification is not required under 24 C.F.R. Part 92 or 2 C.F.R. Part 200 for progressive disbursement of HOME funds upon verified work completion.

136.    On November 30, 2022, Defendant Sanchez sent an email stating: "You recently requested the Neighborhood Improvement Development Corporation (NIDC) to make an exception to our policy and release NIDC loan funds prior to all other funds being exhausted"

(Exhibit J). No written policy requiring exhaustion of other funds before NIDC disbursement exists in the Residential Rehabilitation Agreement (Exhibit B), the Commercial Corridor Agreement (Exhibit A), or applicable federal regulations.

137.    In the same November 30, 2022 email, Defendant Sanchez referenced "the contract established between you and BGI Construction Management" as the basis for his cost calculations (Exhibit J). This is the document delivered by Defendant Pellett that Amrhein confirmed he had never seen before (Exhibit F).

138.    In the same email, Defendant Sanchez stated: "the NIDC Administrative Review Committee will not allow an exception to release funds before the completion of the project" (Exhibit J). The Residential Rehabilitation Agreement required progressive disbursement within five days of verified inspection, not completion of the entire project (Exhibit B, Section 4(e)).

139.    Under Sanchez's November 30, 2022 directive, Plaintiff would receive no residential reimbursement funds until project completion. Without residential reimbursements totaling $29,998,Plaintiff lacked capital to continue construction toward the commercial milestones required under the Commercial Corridor Agreement (Exhibit A).

140.    Defendant Sanchez stated to Plaintiff: "People like you don't deserve the money." When Plaintiff asked whether Sanchez meant "Black people or people from the north side of Milwaukee," Sanchez responded: "both."

141.    Plaintiff's development project, valued at $311,470 and intended to provide affordable housing units and community businesses in Milwaukee's north side neighborhood, failed. Plaintiff was forced to sell the property at a loss (Exhibit Q-1).

**K.    Financial Impact and Validated Business Plans**

142.    As a direct result of the unauthorized contract modifications and cost increases, Plaintiff was required to provide additional financing beyond the original project scope to cover artificially created cost overruns.

143.    Construction manager Michael Amrhein submitted comprehensive Payment Applications on behalf of Plaintiff, including:

(a) First transmittal letter dated May 31, 2022 with comprehensive invoices for work completed;

(b) Second transmittal letter dated August 23, 2022 after the first submission was improperly rejected by defendant Pellett;

(c) Supporting documentation including personal credit card statements, bank statements, and invoices as required by city payment processing procedures (Exhibits E, K-1).

144.    The submitted applications fully complied with city requirements for payment processing documentation and CDBG documentation requirements, including "copies of all paid invoices, cancelled checks, credit card statements and/or bank statements for all of the work related to the grant" as specified in official city payment processing guidelines.

145.    Among the submitted invoices were PayPal payments specifically documenting "window change order" costs necessitated by defendant Askin's unauthorized historic requirements, providing direct documentary evidence linking the imposed requirements to actual financial expenditures.

146.    Professional services required to track and document the financial impact and maintain compliance with funding requirements totaled substantial costs over the project period, as documented in professional service invoices (Exhibit K).

147.    Plaintiff's business plans for Dress'n Up Restaurant and The Blue Lotus Café (Exhibit L) underwent rigorous professional evaluation by MEDC/NWSCDC loan committee, including comprehensive financial analysis, cash flow projections, and risk assessment conducted in June-July 2020 (Exhibits L, T - Business Plans and MEDC/NWSCDC Credit Presentations).

148.    Based on professional underwriting analysis, MEDC approved a $150,000 loan facility specifically secured by the proposed business operations, providing third-party validation of the economic viability of Plaintiff's business plans and confirming the substantial economic opportunity lost due to defendants' discriminatory conduct.

149.    The delays and changed project terms eliminated Plaintiff's ability to realize planned business opportunities, as the planned commercial enterprises required operational financing during construction phases that became unavailable due to the project complications.

**L.    Discovery Rule, Fraudulent Concealment, and Continuing Violations**

150.    The applicable statute of limitations for federal civil rights claims is tolled during periods of municipal silence and deliberate indifference, as defendants actively concealed their wrongdoing and prevented Plaintiff from obtaining complete information necessary to file claims through their systematic non-responsiveness and document concealment.

151.    The discovery rule applies where government actors engage in active concealment through document forgery, creating false administrative barriers, and failure to respond to civil rights complaints.

152.    After Ben Sanchez's final denial of escrow funds in April 2024, Plaintiff hired an IT document specialist in May 2024 who organized all emails and documents chronologically in an Excel database, enabling Plaintiff to fully discover the sophisticated multi-departmental scheme

for the first time through comprehensive document analysis (Exhibit S – Forensic Analysis Timeline).

153.    The discriminatory conduct constitutes a continuing violation spanning 2020–2024, with each act of concealment, document forgery, fund withholding, and racist statement being part of the same unlawful practice involving common actors, policies, and discriminatory basis.

154.    Under National Railroad Passenger Corp. v. Morgan, the entire scheme is actionable because the discriminatory conduct was systematic and ongoing rather than discrete incidents.

**M.    Evidence of Municipal Custom and Pattern**

155.    Third-party witness Jennifer O'Hear of Common Ground Wisconsin has documented knowledge of multiple similar cases involving the City's discriminatory practices.

156.    In a January 13, 2025 email, she stated: "I heard about a similar case where a developer was promised CDBG funds and the City backed out," and further indicated she was "going to check with another attorney to see if he would be interested in meeting with you and another person who has a strikingly similar story."

157.    This establishes that the discriminatory conduct toward Plaintiff was not isolated but part of a well-established municipal practice affecting multiple developers (Exhibit R).

158.    Ms. O'Hear's reference to "another person who has a strikingly similar story" and her coordination with attorneys familiar with these cases demonstrates that the City's practice of withdrawing promised funding commitments to developers is sufficiently widespread and systematic to constitute a municipal custom under Monell, supporting liability for the constitutional violations alleged herein.

**N.    Section 3 Violations and Lost Affordable Housing**

159.     The discriminatory scheme prevented compliance with Section 3 requirements (24 CFR Part 75) by denying economic opportunities for low-income persons through racially motivated obstruction of both residential and commercial developments.

160.     As a direct result of defendants' artificially inflated costs, Plaintiff was forced to charge market rates rather than affordable rates, permanently eliminating affordable housing units intended for low-income residents.

161.     The scheme specifically targeted HUD-funded Section 3 programs designed to create economic opportunities for low-income persons in predominantly African American neighborhoods.

162.     On April 30, 2025, HUD's Office of Fair Housing and Equal Opportunity determined that Plaintiff's allegations constitute "Section 3 Regulatory and Compliance issues" and directed Plaintiff to the Office of Inspector General (Case Number 824534) (Exhibit P).

163.     HUD explicitly preserved Plaintiff's right to file a federal civil lawsuit, confirming that administrative proceeding time does not count against the statutory filing period.

**O.     Concrete Financial Harm and Quantified Damages**

164.     As a direct result of defendants' discriminatory conduct, Plaintiff currently experiences ongoing financial obligations related to the failed project.

165.     Plaintiff was forced to dispose of the property at a substantial loss below appraised value, as documented in broker price opinion and sales records (Exhibit Q-1).

166.     Plaintiff permanently lost the opportunity to operate two approved commercial enterprises that would have generated substantial annual revenue, as documented in professionally validated business plans (Exhibit L) that underwent rigorous MEDC/NWSCDC

loan committee evaluation including comprehensive financial analysis, cash flow projections, and risk assessment resulting in $150,000 loan approval (Exhibit Q-2, Exhibit T).

167.     Financial remediation costs necessitated by the project failure represent ongoing financial injury as documented in debt management agreements (Exhibit Q-3).

168.     As detailed in the comprehensive economic analysis (Exhibit Q-2), the discriminatory scheme caused Plaintiff to suffer financial losses exceeding $5,600,000 in direct damages, lost business opportunities, ongoing financial obligations, and diminished property values.

169.     The discriminatory conduct permanently eliminated affordable housing units from Milwaukee's community and planned businesses that would have created economic opportunities.

**P.     DCD Commercial Corridor Fund Source Uncertainty**

170.     While Plaintiff can confirm that the NIDC funds ($29,998) were federal HOME Investment Partnership Program funds (Grant M-20-MC-55-0213), Plaintiff cannot definitively confirm whether the DCD Commercial Corridor funds ($65,523) were federal or local in origin.

171.     Regardless of the source of DCD funds, the coordinated withholding of both funding streams as part of the discriminatory scheme violated federal civil rights laws and constitutional protections.

172.     The uncertainty regarding DCD fund sources does not diminish the clear federal program violations related to the HOME Investment Partnership Program funds and CDBG program requirements that governed the overall project administration.

**Q.     False Certifications and Federal Program Fraud**

173.　Defendants' conduct violated 18 U.S.C. § 1001 by knowingly making materially false statements to federal agencies.

174.　Specifically:

(a) the City submitted annual certifications to HUD claiming compliance with civil rights requirements while systematically discriminating against Plaintiff;

(b) Sanchez's admission to "developing the narrative" for federal reporting purposes demonstrates intentional falsification of program documentation;

(c) Pellett's creation of fraudulent cost documents was designed to deceive federal oversight bodies regarding legitimate program expenditures; and

(d) these systematic deceptions enabled continued receipt of federal funds while violating civil rights laws, as evidenced by HUD's referral to the Office of Inspector General.

175.　The City's systematic submission of false compliance certifications to HUD while operating the discriminatory scheme described herein constitutes material deception that enabled continued federal funding.

176.　These false statements provide evidence of intentional discrimination and establish the federal nexus required for enhanced liability.

### V.　CLAIMS FOR RELIEF

COUNT I: 42 U.S.C. § 1983 – EQUAL PROTECTION VIOLATION

(Against All Defendants)

177.　Plaintiff realleges and incorporates by reference paragraphs 1 through 174 as though fully set forth herein.

178.  At all times relevant, Defendants acted under color of state law within the meaning of 42 U.S.C. § 1983.

179.  Defendants intentionally discriminated against Plaintiff on the basis of race, in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

180.  Defendants' discriminatory intent and purpose are demonstrated by the following:

a. **Explicit Racial Statements:** Defendant Benjamin Sanchez, the City's Housing Rehabilitation Manager, expressly told Plaintiff that he "didn't deserve the money because people like you don't deserve the money," clarifying he meant both Black people and people from Milwaukee's north side.

b. **Procedural Departures:** Defendants departed from normal administrative and contracting procedures by using forged "Owner Development Agreements" and by imposing unauthorized "historic preservation" requirements.

c. **Disparate Treatment:** Plaintiff was treated materially differently than similarly situated white developers participating in federally funded programs.

d. **Municipal Ratification:** The City and supervisory officials failed to take corrective action after receiving explicit race-based complaints, evidencing municipal approval of discriminatory conduct.

e. **Coordinated Breaches:** Defendants collectively modified and obstructed Plaintiff's residential and commercial contracts without authorization, undermining both projects.

f. **Pretextual Fraud Allegations:** Defendant Sanchez fabricated false "double-billing" accusations, knowingly relied on falsified documentation, and, when exposed, reverted to overt racial hostility.

181.   The coordinated forgery of documents, imposition of unauthorized requirements, and obstruction of federal-fund disbursement were undertaken to create impossible financial conditions for minority developers and to exclude Plaintiff from HUD-funded housing programs, as confirmed by the professional forensic analysis (Exhibit S).

182.   Defendants knowingly submitted materially false certifications of compliance with federal civil-rights requirements to HUD while simultaneously engaging in racial discrimination. This pattern constitutes deliberate indifference and provides compelling circumstantial evidence of discriminatory intent under *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977).

183.   The fabrication of cost data and creation of false "administrative narratives" were designed to conceal civil-rights violations from federal oversight, demonstrating consciousness of wrongdoing and purposeful discrimination.

184.   No legitimate governmental or programmatic purpose justified Defendants' disparate treatment of Plaintiff's project through forged documentation, fabricated cost structures, and unauthorized preservation mandates.

COUNT II – VIOLATION OF TITLE VI OF THE CIVIL RIGHTS ACT OF 1964

(42 U.S.C. § 2000d)

(Against Defendant City of Milwaukee)

185.   Plaintiff realleges and incorporates by reference paragraphs 1 through 182 as though fully set forth herein.

186.    Defendant City of Milwaukee is a direct recipient of substantial federal financial assistance from the U.S. Department of Housing and Urban Development, including but not limited to:

(a) HOME Investment Partnerships Program Grant No. M-20-MC-55-0213; and

(b) Community Development Block Grant No. B-20-MC-55-0017.

187.    By and through its officers, employees, and agents, the City intentionally discriminated against Plaintiff on the basis of race in the administration of these federally funded programs. Evidence of this intentional discrimination includes:

(a) racially explicit statements by City official Benjamin Sanchez;

(b) use of falsified and forged documents to obstruct the release of federal funds;

(c) unauthorized contract modifications and imposition of non-existent historic requirements; and

(d) systematically different treatment of minority developers compared to similarly situated white applicants.

188.    The City's continued receipt of federal housing and community-development funds was expressly conditioned upon truthful compliance certifications to HUD affirming adherence to Title VI and other civil-rights laws.

189.    The City, through its agents, knowingly submitted false compliance certifications while administering programs in a racially discriminatory manner. Such material misrepresentations constitute deliberate deception of a federal agency and establish the requisite federal nexus for Title VI liability.

190.    As a direct and proximate result of this discrimination, Plaintiff was denied equal access to federally funded housing-rehabilitation benefits, including wrongful withholding of $29,998 in HOME funds and related disbursements, all supported by documentary and forensic evidence (Exhibit S).

## COUNT III – VIOLATION OF SECTION 109 OF THE HOUSING AND COMMUNITY DEVELOPMENT ACT (42 U.S.C. § 5309)

### (Against Defendant City of Milwaukee)

191.    Plaintiff realleges and incorporates by reference paragraphs 1 through 188 as though fully set forth herein.

192.    Section 109 of the Housing and Community Development Act of 1974 ("HCDA"), 42 U.S.C. § 5309, prohibits discrimination on the basis of race, color, national origin, religion, or sex in any program or activity funded in whole or in part by Community Development Block Grant (CDBG) funds or related federal housing programs.

193.    Defendant City of Milwaukee administers federally funded programs subject to Section 109, including the CDBG Program and HOME Investment Partnerships Program, both of which are governed by HUD regulations at 24 C.F.R. Parts 91, 92, and 570, and by Wisconsin's CDBG Housing Program Manual.

194.    The City violated Section 109 by engaging in and ratifying racially discriminatory conduct in the administration of CDBG-funded programs, including:

a. Permitting City officials to make explicit racist statements toward Plaintiff, an African-American developer;

b. Using forged and falsified contractual documents to justify withholding federally allocated rehabilitation funds;

c. Imposing unauthorized "historic preservation" requirements and other contractual modifications without legal or regulatory authority; and

d. Systematically withholding and delaying disbursement of approved federal funds in violation of HUD's required progressive disbursement and documentation procedures.

195.    The City further violated mandatory CDBG program management standards by:

a. Failing to ensure equal-opportunity compliance under 24 C.F.R. §§ 570.601–602;

b. Failing to maintain proper financial management and internal-control documentation as required by 24 C.F.R. § 570.501(b) and 2 C.F.R. Part 200; and

c. Failing to ensure timely payment of obligations and proper program administration as mandated by 24 C.F.R. § 570.501(b) and 2 C.F.R. § 200.305.

196.    The City's actions and omissions constitute intentional discrimination and unlawful administration of federally funded housing programs in violation of Section 109 and its implementing regulations.

COUNT IV – DEPRIVATION OF PROPERTY WITHOUT DUE PROCESS OF LAW

(42 U.S.C. § 1983)

(Against All Defendants)

197.    Plaintiff realleges and incorporates by reference paragraphs 1 through 194 as though fully set forth herein.

198. Plaintiff possessed a legitimate property interest in contractually obligated funds held in escrow under the City's residential and commercial rehabilitation contracts, totaling approximately $95,521 (consisting of $29,998 in federal HOME funds and $65,523 in DCD Commercial Corridor funds).

199. Defendants, acting under color of state law, deprived Plaintiff of that property without due process of law, in violation of the Fourteenth Amendment to the United States Constitution.

200. Defendants' deprivations occurred through a deliberate pattern of procedural misconduct, including:

a. Conducting secret administrative proceedings and internal "review committees" using forged and falsified documents;

b. Denying Plaintiff any meaningful opportunity to contest fabricated allegations of fraud or to be heard before adverse determinations;

c. Applying shifting and unpublished requirements inconsistent with written contracts and established CDBG procedures;

d. Coercing Plaintiff's signature on fraudulent contract documents as a condition for releasing federal funds; and

e. Unilaterally modifying contract terms through unauthorized "historic preservation" mandates that materially altered the scope and cost of Plaintiff's projects.

201. The process afforded to Plaintiff fell well below the constitutional minimums articulated in Mathews v. Eldridge, 424 U.S. 319 (1976), and subsequent precedent, as Defendants provided no notice, hearing, or impartial decisionmaker before depriving Plaintiff of his property interests.

202.    These due-process violations were compounded by Defendant Benjamin Sanchez's deliberate use of knowingly false fraud accusations and forged documents to justify withholding funds, further demonstrating bad faith and reckless disregard of constitutional obligations.

## COUNT V – VIOLATION OF THE FAIR HOUSING ACT (42 U.S.C. § 3617)

### (Against All Defendants)

203.    Plaintiff realleges and incorporates by reference paragraphs 1 through 200 as though fully set forth herein.

204.    Under 42 U.S.C. § 3617, it is unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of having exercised or enjoyed, rights granted or protected by the Fair Housing Act, 42 U.S.C. §§ 3601–3619.

205.    Defendants, acting individually and collectively under color of state law, engaged in racially motivated conduct that interfered with Plaintiff's rights to develop, finance, and rehabilitate housing for occupancy by residents in Milwaukee's predominantly African American neighborhoods.

206.    Defendants intentionally erected barriers to Plaintiff's housing development activities by:

a. Forging and falsifying project documents to artificially inflate costs and create pretextual justifications for withholding federal rehabilitation funds;

b. Imposing unauthorized contract modifications and "historic preservation" requirements not applied to similarly situated white developers;

c. Engaging in racially charged statements and conduct evidencing overt discriminatory animus; and

d. Withholding federally obligated HOME and CDBG funds in violation of established program procedures, thereby obstructing the development of affordable housing units.

207.    Defendants' discriminatory acts and coordinated obstruction directly interfered with the creation of affordable housing units in a historically underserved area of Milwaukee, depriving both Plaintiff and local residents of fair and equal access to federally assisted housing opportunities.

208.    As a result of Defendants' conduct, two federally subsidized affordable housing units were permanently eliminated from Milwaukee's housing stock, reducing the availability of safe and affordable housing for low-income residents and undermining the Fair Housing Act's core purpose of fostering equal housing opportunity.

209.    Defendants' actions constitute unlawful interference and retaliation prohibited by 42 U.S.C. § 3617, and were undertaken with knowing disregard of Plaintiff's federally protected rights.

COUNT VI – VIOLATION OF FEDERAL CDBG ADMINISTRATION REQUIREMENTS

(Against Defendant City of Milwaukee and Defendant Lisa Maney)

210.    Plaintiff realleges and incorporates by reference paragraphs 1 through 207 as though fully set forth herein.

211.    The Community Development Block Grant ("CDBG") program, administered under Title I of the Housing and Community Development Act of 1974, 42 U.S.C. § 5301 et seq., imposes strict federal administrative and compliance obligations on all grant recipients. Applicable federal regulations include 24 C.F.R. § 570.501(b) (entitlement recipient responsibility), 24 C.F.R. § 570.506 (entitlement recordkeeping), 24 C.F.R. § 570.607

(employment and contracting opportunities including Section 3), 24 C.F.R. § 570.200(a)(5) (incorporating cost principles), 24 C.F.R. § 92.504(a) (HOME participating jurisdiction responsibility), and 2 C.F.R. Part 200 (uniform administrative requirements), which collectively require proper recipient responsibility, interdepartmental coordination, prevention of ineligible costs, maintenance of adequate internal controls, and protection of economic opportunities for low- and moderate-income persons.

212.    Under 24 C.F.R. § 570.501(b), Defendant City of Milwaukee bears absolute and non-delegable responsibility to ensure that all CDBG funds are used in accordance with applicable laws and program requirements. The City's delegation of duties to sub-agencies, contractors, or inspectors does not relieve it of liability for noncompliance.

213.    On or about March 23, 2022, Defendant Lisa Maney, acting in her capacity as a Commercial Code Inspector for the City's Department of Neighborhood Services ("DNS"), issued violation orders directing Plaintiff to "scrape and paint wood surfaces on the exterior storefront" of the property located at 5128–5130 W. Center Street (Exhibit M).

214.    Defendant Maney's directive directly conflicted with approved plans including residential/commercial scopes of work and prior determinations of the City's Historic Preservation Commission, which required complete storefront replacement rather than cosmetic repainting **(Exhibits A, M)**.

215.    This directive introduced ineligible costs under federal rehabilitation standards in violation of 24 C.F.R. § 570.202(c), which explicitly states that "code enforcement" activities do not include "the cost of correcting the violations."

216.    By imposing directives outside the approved rehabilitation scope, Defendant Maney and the City violated multiple federal regulations, including:

a. 24 C.F.R. § 570.501(b) – failure to ensure CDBG funds are used in accordance with program requirements, a responsibility that cannot be delegated to other municipal agencies;

b. 2 C.F.R. § 200.303 – failure to maintain effective internal controls to provide reasonable assurance of compliance with federal statutes and regulations;

c. 24 C.F.R. § 570.207(a) – creating ineligible costs not authorized under the regulations; and

d. 2 C.F.R. §§ 200.403–405 – violating cost principles requiring costs be necessary, reasonable, and allocable to the approved activity.

217.    Defendant Maney's conduct further obstructed Section 3 economic opportunity compliance by creating unnecessary, non-scope work that increased project costs and delayed completion, thereby reducing job and contract opportunities for low-income workers and small businesses, in violation of 24 C.F.R. § 570.607(b) and 24 C.F.R. Part 75.

218.    The violations cited by Defendant Maney concerned long-standing conditions that existed during the City's 11-year ownership of the property, yet were imposed only after Plaintiff began federally funded rehabilitation work. This conduct demonstrates deliberate obstruction and bad faith, contrary to the federal requirements for allowability, allocability, and reasonableness of costs under 2 C.F.R. §§ 200.303, 200.403, 200.404, and 200.405.

219.    The conflicting directives issued by DNS, the Historic Preservation Commission ("HPC"), and the Neighborhood Improvement Development Corporation ("NIDC")/Department

of City Development ("DCD") created "ineligible costs" under federal definitions and the Wisconsin CDBG Housing Program Manual, which explicitly states that "improperly procured services or goods are deemed ineligible costs."

220.    The City's repeated failure to maintain and enforce interdepartmental coordination procedures constitutes an ongoing municipal custom within the meaning of *Monell v. Department of Social Services*, 436 U.S. 658 (1978), as evidenced by a recurring pattern of conflicting directives across federally funded housing projects.

221.    A comprehensive search of the City of Milwaukee's public property database revealed no record of Defendant Maney's March 23, 2022 code violations, despite their documented existence in Plaintiff's contemporaneous email correspondence and their enforcement against Plaintiff's federally funded project (Exhibit M).

222.    The deliberate omission of these records violates both Wis. Stat. § 19.35(1)(a), which presumes public access to governmental records, and 24 C.F.R. § 570.506, which mandates recordkeeping and retention of CDBG compliance documents for entitlement grantees. This concealment demonstrates a coordinated attempt to suppress evidence of discriminatory enforcement and to evade HUD oversight.

223.    When Plaintiff sought removal of the fines pursuant to established administrative procedures, Defendant Maney categorically responded that "the reinspection fees will not be waived" (Exhibit M), reflecting predetermined bias, disregard for due process, and failure to follow required municipal appeal procedures under both local and federal program regulations.

224.    This pattern of misconduct is corroborated by HUD's correspondence dated April 30, 2025, which administratively closed Plaintiff's Fair Housing intake and expressly referred the

matter to HUD's Section 3 Compliance Division and the Office of Inspector General ("OIG"), confirming that the issues described herein constitute federal program administration failures requiring corrective oversight and potential enforcement action.

## COUNT VII – FEDERAL PROGRAM DECEPTION (18 U.S.C. § 1001)

### (Against All Defendants)

225. Plaintiff realleges and incorporates by reference paragraphs 1 through 222 as though fully set forth herein.

226. Defendants, acting individually and collectively under color of state law, knowingly and willfully made materially false statements and representations to the U.S. Department of Housing and Urban Development (HUD) in connection with federally funded programs, including but not limited to:

> a. Submitting false and misleading compliance certifications asserting nondiscrimination and regulatory adherence;
>
> b. Creating and transmitting forged or falsified cost documentation to justify denial or withholding of federal funds; and
>
> c. Preparing and maintaining internal "narratives" and records intended to conceal discriminatory practices from HUD oversight and audit review.

227. These false statements and omissions were material because they directly affected the continued receipt and use of federal CDBG and HOME funds.

228. Defendants' false statements concealed forged cost documentation created by Defendant Pellett, as documented in Exhibits F and G.

229.    Defendants' false statements concealed contradictory internal directives that prevented timely disbursement, as documented in Exhibits H, I, and J.

230.    The Forensic Analysis Timeline (Exhibit S) documents Defendants' reliance on falsified records to justify withholding federally obligated funds.

231.    Plaintiff asserts these statutory violations both as independent acts of federal program deception and as corroborative evidence supporting his claims under 42 U.S.C. § 1983, Title VI, and Section 109 of the Housing and Community Development Act.

232.    Plaintiff has referred these matters to the HUD Office of Inspector General pursuant to the Inspector General Act of 1978 and the reporting provisions of the False Claims Act, 31 U.S.C. § 3730.

233.    Plaintiff respectfully requests that the Court, pursuant to its inherent supervisory authority and Wisconsin Rules of Evidence, take notice of the evidence of potential violations of 18 U.S.C. § 1001 and related federal program requirements contained in this record, and acknowledge Plaintiff's statutory right to submit this material to appropriate federal oversight authorities for independent review. Plaintiff does not seek an order compelling federal investigation.

## COUNT VIII – BREACH OF CONTRACT (RESIDENTIAL REHABILITATION AGREEMENT)

### (Against Defendant City of Milwaukee)

234.    Plaintiff realleges and incorporates by reference paragraphs 1 through 230 as though fully set forth herein.

235.    Plaintiff entered into a valid and enforceable Residential Rehabilitation Agreement with the City of Milwaukee through its Neighborhood Improvement Development Corporation (NIDC), providing $29,998 in federal HOME Investment Partnerships Program funds for the rehabilitation of residential units at Plaintiff's property located at 5128–5130 W. Center Street.

236.    The Residential Rehabilitation Agreement (Exhibit B) required the City to issue progressive disbursements within five (5) days after inspection upon submission of verified invoices, lien waivers, and proof of payment. Plaintiff fully complied with all contractual requirements, as demonstrated by Exhibits D, E, F, and N, including payment applications dated May 31, 2022 and August 23, 2022, inspection confirmations, and supporting financial documentation.

237.    Between May 31, 2022, August 23, 2022, September 2022, November 10–17, 2022, and April 2024, Plaintiff properly requested release of HOME funds in full compliance with the Residential Agreement. The City materially breached the contract by:

(a) refusing to release eligible funds despite verified inspections;

(b) imposing unauthorized new conditions, including asset verification and administrative committee review;

(c) relying on forged cost documents created by Defendant Pellett; and

(d) failing to authorize disbursement within the contractual five-day period.

These breaches caused unreimbursed construction costs, project delays, and severe financial harm.

## COUNT IX – BREACH OF CONTRACT (COMMERCIAL REHABILITATION AGREEMENT)

### (Against Defendant City of Milwaukee)

238.    Plaintiff realleges and incorporates by reference paragraphs 1 through 234 as though fully set forth herein.

239.    Plaintiff entered into a valid and enforceable Commercial Rehabilitation Agreement (Exhibit A) with the City of Milwaukee, through its Department of City Development ("DCD"), under which Plaintiff was awarded $65,523 from the City's Commercial Corridor Fund to support commercial redevelopment at 5128–5130 W. Center Street, Milwaukee, Wisconsin.

240.    Plaintiff was ready, willing, and able to perform all commercial rehabilitation work contemplated under the Commercial Corridor Agreement (Exhibit A). However, the City, acting through its agents, materially breached the Agreement by obstructing Plaintiff's ability to perform from the outset. The City imposed unauthorized historic-preservation requirements, issued contradictory code-enforcement directives through Defendant Maney that added costs to the commercial storefront, relied on forged documentation, and created fabricated administrative barriers that made performance impossible.

241.    The City's prevention of commercial performance was directly caused by its wrongful withholding of residential funds. The $29,998 in HOME funds, if disbursed as contractually required, would have replenished Plaintiff's capital and enabled completion of work necessary to reach commercial milestones. By withholding residential reimbursements while simultaneously imposing additional costs through Defendant Maney's contradictory code directives, Defendants created an insurmountable financial barrier that made commercial completion impossible.

242.     Because the City's own actions prevented performance, Plaintiff is deemed to have satisfied all conditions precedent under the doctrine of prevention of performance, and the City's obstruction itself constitutes a material breach. Plaintiff never received any portion of the $65,523 Commercial Corridor funds, nor was Plaintiff permitted to complete commercial rehabilitation due solely to Defendants' unlawful interference.

243.     Plaintiff's readiness to perform and the City's obstruction are documented in Exhibits K, K-1, L, Q-1, and Q-2, including payment applications, financial records, professionally validated business plans, underwriting materials, and economic-loss analyses confirming that commercial performance was prevented solely by Defendants' conduct.

244.     The City materially breached the Commercial Rehabilitation Agreement (Exhibit A)by:

a. Imposing unauthorized and unapproved historic preservation requirements that significantly altered the project scope and increased costs, without compliance with Section 106 of the National Historic Preservation Act or local procedural rules under Milwaukee Code § 320-21;

b. Using forged and falsified documentation to justify denial and delay of disbursements; and

c. Failing to release contractually obligated funds in accordance with federal and municipal grant-administration standards.

245.     The City's breaches occurred in bad faith and directly undermined the purpose of the agreement—to facilitate small-business revitalization in underserved areas—causing Plaintiff to sustain severe financial harm and project collapse.

246.　As a direct and proximate result of the City's obstruction and prevention of performance, Plaintiff lost the entirety of the Commercial Corridor funding, lost the ability to complete commercial rehabilitation, and lost the opportunity to operate the businesses approved and validated through MEDC/NWSCDC underwriting. These damages represent loss of the benefit of the bargain and lost economic opportunity, not failure of performance by Plaintiff.

## COUNT X – CONVERSION

### (Against Defendant City of Milwaukee)

247.　Plaintiff realleges and incorporates by reference paragraphs 1 through 243 as though fully set forth herein.

248.　The City of Milwaukee wrongfully exercised dominion and control over specifically earmarked and contractually obligated funds, including $29,998 in federal HOME funds and $65,523 in Commercial Corridor funds, by refusing to release or disburse those funds in bad faith after contractual conditions were satisfied or excused by prevention of performance. These funds totaled $95,521, consisting of:

a. $29,998 in HOME Investment Partnerships Program funds designated for residential rehabilitation; and

b. $65,523 in DCD Commercial Corridor funds designated for commercial redevelopment.

249.　Plaintiff had a lawful and identifiable ownership interest in those funds under executed contracts that required disbursement upon verified completion of work.

250.　The City, acting through its agents and employees, intentionally withheld and retained those funds by means of forged documentation, fabricated administrative barriers, and

knowingly false pretexts, thereby depriving Plaintiff of property in violation of Wisconsin common law.

251.    The City's actions constitute intentional conversion, as its retention and use of the funds were unauthorized, inconsistent with the terms of the governing contracts, and undertaken in bad faith.

252.    As a direct and proximate result, Plaintiff suffered measurable financial injury, including loss of contractual payments, project termination, and substantial consequential damages.

COUNT XI – VIOLATION OF WISCONSIN PUBLIC RECORDS LAW (WIS. STAT. § 19.37)

(Against Defendant Lisa Maney and Defendant City of Milwaukee)

253.    Plaintiff realleges and incorporates by reference paragraphs 1 through 249 as though fully set forth herein.

254.    Pursuant to Wisconsin Statute § 19.35(1)(a), the public is entitled to inspect or copy records maintained by governmental entities, and Wis. Stat. § 19.37 authorizes relief for arbitrary or capricious denials of access to such records.

255.    Defendant Lisa Maney, acting in her official capacity as a Commercial Code Inspector for the City's Department of Neighborhood Services ("DNS"), caused or directed the concealment of public records related to Plaintiff's project, including the March 23, 2022 code-violation orders and related documentation, by failing to enter or maintain those records in the City's public property database (Exhibit M, pp. 3-4).

256.    On information and belief, this concealment was intentional and designed to prevent Plaintiff from obtaining evidence necessary to contest discriminatory enforcement actions, thereby obstructing both administrative and judicial review.

257.    The City of Milwaukee, as custodian of its departmental records, is jointly responsible for ensuring compliance with Wisconsin's public-records law. By failing to maintain, produce, or disclose the subject records, the City acted arbitrarily and in violation of its statutory duties.

258.    The records at issue involve federally funded CDBG enforcement activities and are subject to heightened transparency requirements under 24 C.F.R. § 570.506, which mandates recordkeeping and retention of CDBG compliance documents for entitlement grantees.

259.    Defendants' concealment and refusal to provide access violated both state and federal transparency obligations and prevented Plaintiff from pursuing timely administrative relief.

260.    As a direct result of Defendants' unlawful withholding of records, Plaintiff suffered harm including deprivation of due process, inability to contest discriminatory enforcement, and increased legal expenses.

## PRAYER FOR RELIEF

WHEREFORE, having set forth the foregoing causes of action, Plaintiff CORDAY ALEXANDER LINTON respectfully prays that this Honorable Court enter judgment in his favor and against all named Defendants, jointly and severally where applicable, and grant the following relief:

**A.    Declaratory Relief**

1.    Declare that Defendants, acting under color of state law, violated Plaintiff's rights under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983

by engaging in intentional racial discrimination, procedural deprivation, and arbitrary governmental conduct.

2. Declare that the City of Milwaukee violated Title VI of the Civil Rights Act of 1964, Section 109 of the Housing and Community Development Act, and the Fair Housing Act by administering federally funded programs in a racially discriminatory, deceptive, and fraudulent manner.

3. Declare that the City of Milwaukee's actions, policies, and practices violated applicable Wisconsin state laws, including common-law contract and tort principles, and statutory obligations under Wis. Stat. § 19.37 (Public Records Law).

**B.    Injunctive and Equitable Relief**

4. Issue a comprehensive permanent injunction requiring the City of Milwaukee and all affiliated departments, including the Department of City Development (DCD), Neighborhood Improvement Development Corporation (NIDC), and Department of Neighborhood Services (DNS), to:

    i. Cease and desist from further discriminatory or retaliatory practices in the administration of HUD-funded programs;

    ii. Implement and maintain effective nondiscrimination, transparency, and due-process safeguards in all federally funded housing and community-development programs;

    iii. Establish mandatory Title VI and Section 109 compliance procedures and oversight mechanisms;

iv. Implement federal Section 106 consultation procedures under the National Historic Preservation Act for any project designated as historically significant;

v. Provide mandatory anti-discrimination and federal regulatory compliance training to all officials involved in HUD program administration;

vi. Implement proper CDBG compliance procedures including progressive disbursement protocols and accurate documentation standards consistent with 24 C.F.R. § 570.202(c);

vii. Revise internal oversight procedures to ensure compliance with 24 C.F.R. Parts 91, 92, and 570, 2 C.F.R. § 200.113, and related HUD regulations;

viii. Establish independent oversight for historic-preservation requirements to prevent unauthorized or discriminatory contract modifications;

ix. Implement transparency mechanisms consistent with 24 C.F.R. § 570.506 requiring all federally funded code enforcement records be maintained in accordance with federal recordkeeping requirements;

x. Establish independent oversight mechanisms for Inspector General complaint processing, with mandatory response timeframes, federal reporting procedures, and corrective-action follow-up; and

xi. Preserve and publicly disclose all records relating to Plaintiff's projects and all similarly situated HUD-funded projects for at least five (5) years.

5. Order Defendants to release all contractually owed funds wrongfully withheld from Plaintiff (comprising $29,998 in federal HOME funds and $65,523 in DCD Commercial

Corridor funds) and to restore his eligibility and standing in all City-administered HUD programs.

**C.     Compensatory and Consequential Damages**

6.  Award compensatory damages to Plaintiff, in an amount to be determined at trial but believed to exceed $5,600,000, together with restitution of wrongfully withheld funds totaling $95,521 (comprising $29,998 in federal HOME funds and $65,523 in DCD Commercial Corridor funds), for:

a. Economic losses from forced property disposition below appraised value;

b. Lost business and investment opportunities resulting from project obstruction;

c. Ongoing financial obligations caused by Defendants' fraudulent modifications and delays;

d. Additional financing and compliance costs caused by Defendants' bad-faith conduct;

e. Professional and forensic expenses incurred to expose the document forgery and contract manipulation scheme;

f. Credit and reputational harm caused by Defendants' false fraud allegations; and

g. Lost affordable-housing and community-development opportunities resulting from the City's unlawful conduct.

7.  Award all consequential, incidental, and statutory damages, including potential multipliers reaching $17 million, as detailed in Plaintiff's pre-suit notice served upon Defendants and subject to proof at trial.

**D.     Punitive Damages**

8. Award punitive damages against individual Defendants Benjamin Sanchez, Brian Pellett, Matthew Rejc, Timothy Askin, Aaron Helt, Lisa Maney, and Todd Miller for their willful, malicious, and reckless disregard of Plaintiff's constitutional, statutory, and contractual rights through deliberate falsification, forgery, and bad-faith obstruction of federally funded housing programs.

**E.     Federal Program Fraud and Regulatory Referrals**

9. Federal Program Fraud Referral: Direct referral of Defendants' systematic false statements, falsified documentation, and fraudulent compliance certifications to the HUD Office of Inspector General (OIG) for investigation and potential prosecution under 18 U.S.C. § 1001 and related federal statutes, including the False Claims Act, 31 U.S.C. § 3729.

10. Federal Regulatory Violations Referral: Refer Defendants' systemic violations of 2 C.F.R. § 200.113 (mandatory disclosure of fraud), 24 C.F.R. § 570.501(b) (recipient responsibility), and 24 C.F.R. § 570.506 (entitlement recordkeeping) to the HUD OIG and the U.S. Department of Justice Civil Rights Fraud Initiative for investigation and enforcement, including potential sanctions, repayment demands, suspension or debarment, and trebled damages under the False Claims Act.

**F.     Statutory, Contractual, and Specific Performance Relief**

11. Order specific performance and restitution under the Residential Rehabilitation Agreement (Exhibit B) and Commercial Corridor Fund Agreement (Exhibit A), including:

a. Full payment of all outstanding funds totaling $95,521 (comprising $29,998 in federal HOME funds and $65,523 in DCD Commercial Corridor funds), with interest;

b. Reimbursement for unreimbursed construction, compliance, and inspection costs;

c. Restoration of Plaintiff's contractual rights and project eligibility; and

d. Statutory damages for public-records violations under Wis. Stat. § 19.37(2)(a).

**G.     Attorney's Fees, Costs, and Interest**

12. Award Plaintiff reasonable attorney's fees and litigation costs pursuant to:

(a) 42 U.S.C. § 1988(b) (Civil Rights Attorney's Fees provision);

(b) 42 U.S.C. § 3613(c)(2) (Fair Housing Act fee-shifting);

(c) 24 C.F.R. § 570.912 (HUD enforcement remedies); and

(d) Wis. Stat. § 19.37 and other applicable Wisconsin statutes authorizing recovery of fees in public-records and contract actions.

13. Award prejudgment interest and interest on the verdict and judgment, including post-judgment interest, as provided by Wis. Stat. §§ 814.04(4) and 815.05(8), at the statutory rate until paid.

**H.     Additional and General Relief**

14. Grant such further and additional relief, legal or equitable, as the Court deems just, proper, and necessary to remedy the ongoing effects of Defendants' unlawful conduct—including but not limited to coordination with federal enforcement agencies, structural

oversight reform, and any measures required to prevent future violations of federal and state civil-rights and housing laws.

## JURY DEMAND

Plaintiff respectfully requests trial by jury on all issues so triable.

**EXHIBIT INDEX**

Exhibit A – DCD Commercial Corridor Agreement, approval letters, and plan-check drawings

Exhibit B – NIDC Residential Rehabilitation Agreement (Section 4(e))

Exhibit C – August 30, 2022 Sanchez "narrative development" email

Exhibit C-1 – August 18, 2022 Sanchez email re: Rick Banks

Exhibit D–D5 – Historic Preservation / window requirement documents

Exhibit E – Construction manager disbursement statements

Exhibit F – April 5, 2022 Amrhein email re: forged documents

Exhibit G – Notarized Amrhein fraud statement

Exhibit H – November 10, 2022 asset verification demand

Exhibit I – November 17, 2022 administrative committee email

Exhibit J – November 30, 2022 "exception to policy" email

Exhibit K – Professional services invoices

Exhibit K-1 – Payment applications and financial documentation

Exhibit L – Business plans (Dress'n Up Restaurant / Blue Lotus Café)

Exhibit M – March 23, 2022 DNS code violations

Exhibit N – Email trail disproving "double dipping" allegations

Exhibit O – Wis. Stat. § 893.80 Notice of Claim

Exhibit P – HUD Section 3 / FHEO determination (Case 824534)

Exhibit Q-1 – Broker price opinion and sale documents

Exhibit Q-2 – Comprehensive economic damages analysis

Exhibit Q-3 – Ongoing financial obligations

Exhibit R – Jennifer O'Hear corroborating statement

Exhibit S – Forensic Analysis Timeline

Exhibit T – MEDC/NWSCDC underwriting materials

Exhibit U – Inspector General complaint

Dated Wednesday, January 14, 2026.

**VERONA SWANIGAN, ESQ.**
**WSBN: 1086459**
**THE SWANIGAN FIRM**
**425 W. CAPITOL AVE STE 1533**
**LITTLE ROCK, AR 72201**
**866-603-5239**
**callthelawlady@outlook.com**
**On Behalf of CORDAY ALEXANDER**
**LINTON**