**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT COURT OF WISCONSIN**

CORDAY ALEXANDER LINTON,
Plaintiff,

v.                                                                    Case No. 2:26-cv-00258-JPS

CITY OF MILWAUKEE; BENJAMIN
SANCHEZ, in his individual and official capacities;
MATTHEW REJC, BRIAN PELLETT, TIMOTHY ASKIN, AARON HELT, LISA
MANEY, and TODD MILLER, each in their individual and official capacities,
Defendants.

## PLAINTIFF'S MOTION FOR LEAVE TO FILE FIRST AMENDED COMPLAINT AND RESPONSE TO DEFENDANTS' JOINT MOTION FOR JUDGMENT ON THE PLEADINGS

Plaintiff Corday Alexander Linton, by and through undersigned counsel, respectfully moves this Court for leave to file his proposed First Amended Complaint pursuant to Federal Rule of Civil Procedure 15(a)(2). Plaintiff further responds to Defendants' Joint Motion for Judgment on the Pleadings by requesting that the Court deny that motion as moot or alternatively deny it without prejudice to any motion directed to the operative amended pleading.

In support of this Motion, Plaintiff states as follows:

1. Plaintiff filed this civil rights and related state-law action against Defendants arising from the City of Milwaukee's administration of residential and commercial rehabilitation funding for the property located at 5128–5130 West Center Street, Milwaukee, Wisconsin.

2. Defendants have filed a Joint Motion for Judgment on the Pleadings seeking dismissal of Counts III, V, VI, VII, and XI of Plaintiff's original Complaint. Defendants' motion is directed only to the original pleading and argues, among other things, that certain statutory and regulatory claims lack a private right of action, that the Fair Housing Act claim is insufficiently pleaded, and that the Wisconsin Public Records claim lacks necessary predicate facts.

3.  After reviewing Defendants' position, Plaintiff prepared a proposed First Amended Complaint that narrows the pleadings, removes several claims challenged by Defendants, clarifies the factual basis for the remaining claims, and streamlines the operative issues.

4.  Specifically, the proposed First Amended Complaint removes the prior standalone claims based on federal regulations, the federal false-statements statute, Wisconsin Public Records Law, and Section 109 of the Housing and Community Development Act. The proposed amended pleading preserves relevant factual allegations only where they support remaining claims under the Constitution, Title VI, the Fair Housing Act, and state law.

5.  The proposed First Amended Complaint also supplements and clarifies Plaintiff's Fair Housing Act allegations by pleading that the project included two residential units, that Plaintiff intended to occupy one of those units upon completion, that the residential units were funded in part through HOME funds, and that Defendants' alleged conduct prevented the residential units from being placed into service.

6.  Plaintiff's proposed amendment is made in good faith, is based on the same nucleus of operative facts already pleaded and will not prejudice Defendants. The amendment does not inject an unrelated dispute into the case. Instead, it narrows and clarifies the issues now before the Court.

7.  Defendants have been aware of the relevant factual allegations since the original Complaint. The proposed First Amended Complaint arises from the same project, same parties, same funding streams, same communications, and same alleged course of conduct at issue in the original pleading.

8.  Plaintiff sought to resolve the amendment issue without unnecessary motion practice. Defendants have not consented to the filing of the proposed First Amended Complaint, making leave of Court necessary under Rule 15(a)(2).

9.  Because Defendants' pending Rule 12(c) motion attacks claims in the original Complaint that the proposed First Amended Complaint removes, narrows, or materially revises, the pending motion should be denied as moot if leave to amend is granted.

10. Alternatively, if the Court determines that Defendants should have an opportunity to respond to the amended pleading after it becomes operative, Plaintiff respectfully requests that Defendants' Joint Motion for Judgment on the Pleadings be denied without prejudice to Defendants' ability to file a motion directed to the First Amended Complaint.

11. Granting leave to amend will promote efficiency, avoid unnecessary adjudication of claims Plaintiff no longer seeks to pursue in their original form, and allow the case to proceed on a clearer operative pleading.

12. Plaintiff attaches the proposed First Amended Complaint as **Exhibit A** to this Motion.

WHEREFORE, Plaintiff Corday Alexander Linton respectfully requests that this Court enter an order:

A. Granting Plaintiff leave to file the proposed First Amended Complaint;

B. Directing the Clerk to file the attached First Amended Complaint as the operative pleading in this action;

C. Denying Defendants' Joint Motion for Judgment on the Pleadings as moot;

D. Alternatively, denying Defendants' Joint Motion for Judgment on the Pleadings without prejudice to any motion directed to the operative First Amended Complaint; and

E. Granting such other and further relief as the Court deems just and proper.

Dated: April 30, 2026

By:   /s/ *Verona Swanigan*
**VERONA SWANIGAN**
**STATE BAR NO.: 1086453**
**ATTORNEY FOR PLAINTIFF**
**425 W. CAPITOL AVE ST 1533**
**LITTLE ROCK, AR 72201**
**callthelawlady@outlook.com**
**866-603-5239**

**CERTIFICATE OF SERVICE**

I hereby certify that on April 30, 2026, I electronically filed the foregoing Plaintiff's Motion for Leave to File First Amended Complaint and Response to Defendants' Joint Motion for Judgment on the Pleadings with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

Dated: April 30, 2026

By: /s/Verona Swanigan
Verona Swanigan, Esq.
425 W. Capitol Ave #1533
Little Rock, AR 72201
callthelawlady@outlook.com
866-603-5239

# EXHIBIT A

VERONA SWANIGAN, ESQ.

WSBN: 1086459

THE SWANIGAN FIRM

425 W. CAPITOL AVE STE 1533

LITTLE ROCK, AR 72201

866-603-5239

callthelawlady@outlook.com

CORDAY ALEXANDER LINTON

---

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| CORDAY ALEXANDER LINTON, | Case No. 2:26-cv-00258-SCD |
| Plaintiff, | |
| | **FIRST AMENDED COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| CITY OF MILWAUKEE; BENJAMIN SANCHEZ, in his individual and official capacities; | |

**MATTHEW REJC, BRIAN PELLETT, TIMOTHY ASKIN, AARON HELT, LISA MANEY, and TODD MILLER, each in their individual and official capacities,**

**Defendants.**

## I.      INTRODUCTION

1.      Plaintiff brings this action arising from the City of Milwaukee's administration of residential and commercial rehabilitation funding for 5128–5130 West Center Street. Plaintiff alleges that City officials used altered project documentation, unsupported accusations, unauthorized project requirements, and withholding of disbursement approvals to block completion of the project and deny him the benefits of City-administered and federally assisted housing programs. Plaintiff seeks relief for the injuries caused by those actions.

2.      The project included two residential units, two planned ground-floor businesses, and City-administered rehabilitation funding that Plaintiff alleges was never disbursed despite completed work and submitted draw materials.

3.      The alleged obstruction included altered project-cost documentation, unsupported accusations of duplicate reimbursement, unauthorized project requirements concerning windows and historic review, and contradictory code-enforcement actions that increased costs and delayed completion.

## II.      JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983, Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d et seq.), and the Fair Housing Act (42 U.S.C. § 3601 et seq.).

5.      This Court also has jurisdiction under 28 U.S.C. § 1343(a)(3)–(4), which grants jurisdiction over actions to redress deprivations of civil rights under color of state law.

6.      This Court has supplemental jurisdiction over Plaintiff's related state-law claims—including breach of contract and conversion—under 28 U.S.C. § 1367(a) because those claims arise from the same nucleus of operative facts as the federal causes of action.

7.      Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events, omissions, and injuries giving rise to this action occurred within the City of Milwaukee, Wisconsin, which lies in the Eastern District of Wisconsin.

8.      Defendant City of Milwaukee is a political subdivision of the State of Wisconsin that receives and administers federal funds from the U.S. Department of Housing and Urban Development ("HUD") under programs including the Community Development Block Grant (CDBG) and HOME Investment Partnerships programs.

9.      All individual defendants were employed by or acting on behalf of the City at the time of the events alleged, and each acted under color of state law within the meaning of 42 U.S.C. § 1983.

10.     Plaintiff satisfied all pre-suit notice requirements applicable under Wis. Stat. § 893.80 by serving written notice of claim upon the City of Milwaukee on March 16, 2025, more than 120

days before the filing of this action (Exhibit O). The City's response acknowledged receipt but failed to undertake any substantive investigation into the documented civil rights violations.

### III. PARTIES

**A.    Plaintiff**

11.    Corday Alexander Linton ("Plaintiff") is an African American businessman and real estate developer. He resides in California and formerly resided and conducted business in Milwaukee, Wisconsin.

12.    The property located at 5128–5130 West Center Street was owned by DLK Legacy Investments LLC. Plaintiff Corday Alexander Linton was the sole member and managing member of DLK Legacy Investments LLC, executed the project-related agreements in that capacity, personally managed the project, and personally guaranteed the project debt associated with the rehabilitation financing. Plaintiff also intended to occupy one of the rehabilitated residential units upon completion.

13.    Plaintiff is the intended beneficiary of federally funded housing and community development programs administered by the City of Milwaukee, including the HOME Investment Partnerships Program and Community Development Block Grant (CDBG) programs.

**B.    Defendants**

14.    City of Milwaukee ("City") is a Wisconsin municipal corporation and a designated recipient of substantial federal financial assistance from the U.S. Department of Housing and Urban Development ("HUD"), including CDBG Grant No. B-20-MC-55-0017 and HOME Grant No. M-20-MC-55-0213.

15. The City administered the residential and commercial rehabilitation funding described in this Complaint through its departments and officials.

16. Benjamin Sanchez is sued in his individual and official capacities as Housing Rehabilitation Manager for the Neighborhood Improvement Development Corporation ("NIDC"), a division of the City's Department of City Development ("DCD"). Sanchez exercised supervisory and administrative authority over Plaintiff's rehabilitation contracts and participated in the withholding and review decisions alleged in this Complaint.

17. Brian Pellett is sued in his individual and official capacities as former NIDC Rehabilitation Specialist. Pellett participated in creating and distributing project-cost documentation, including the 'Owner Development Agreement' later used in connection with the denial of disbursement.

18. Matthew Rejc is sued in his individual and official capacities as Neighborhood Business Development Administrator for the Department of City Development. Rejc coordinated with other City officials to perpetuate false narratives and knowingly relied on fraudulent documentation to obstruct Plaintiff's project.

19. Timothy Askin is sued in his individual and official capacities as Historic Preservation Commission Staff Member. Askin imposed unauthorized and costly "historic preservation" requirements on Plaintiff's project without complying with Section 106 consultation procedures or Milwaukee Code § 320-21, causing substantial project delays and expense.

20. Aaron Helt is sued in his individual and official capacities as NIDC Program Manager with supervisory authority over federally funded programs. Helt participated in or failed to

prevent secret administrative reviews and other actions that used falsified documents to block disbursement of federal funds.

21.     Lisa Maney is sued in her individual and official capacities as Commercial Code Inspector for the Department of Neighborhood Services ("DNS"). Maney issued code-enforcement directives affecting the project, including directives Plaintiff alleges were inconsistent with approved plans and records later omitted from the City's public property database.

22.     Todd Miller is sued in his individual and official capacities as Community Outreach Liaison in the Office of the Mayor of Milwaukee. After receiving Plaintiff's documented civil-rights complaints and proof of discrimination, Miller ratified the misconduct by referring the complaints back to the offending officials instead of initiating an independent investigation. Defendant Miller exercised supervisory authority over the City's handling of civil rights complaints involving federally funded housing programs. No higher City official reviewed, modified, or overruled Miller's routing decision. Miller's routing constituted the final municipal disposition of Plaintiff's discrimination complaint.

**C.     Venue and Jurisdiction**

23.     Upon information and belief, Defendants Benjamin Sanchez, Matthew Rejc, Timothy Askin, Lisa Maney, and Todd Miller are current employees of the City of Milwaukee and have been residents of the City of Milwaukee or the State of Wisconsin for more than one year preceding the filing of this action.

24. Upon information and belief, Defendant Brian Pellett is a former employee of the City of Milwaukee and resides at 1713 E Morgan Ave, Milwaukee, WI 53202. He has been a resident of the State of Wisconsin for more than one year preceding the filing of this action.

25. Upon information and belief, Defendant Aaron Helt is a former employee of the City of Milwaukee and resides at 1020 W River Pkwy, Champlin, MN 55316. He has been a resident of the State of Minnesota for more than one year preceding the filing of this action.

26. Defendant City of Milwaukee is a Wisconsin municipal corporation and shall be served at its principal executive office:

City of Milwaukee – Office of the Mayor

200 E. Wells Street

Milwaukee, WI 53202

27. For purposes of municipal liability, the "City of Milwaukee" includes the Office of the Mayor, Department of City Development (DCD), Neighborhood Improvement Development Corporation (NIDC), Department of Neighborhood Services (DNS), the Historic Preservation Commission, and all subordinate departments and officials acting under color of state law.

28. Plaintiff is currently a resident of Los Angeles, California, and has resided there for at least six months.

29. This court has proper venue and personal and subject matter jurisdiction as the allegations and the contract occurred within Milwaukee County, Wisconsin and there is a federal question before the court.

**D.    Agency and Color of Law**

30. At all times relevant, each Defendant acted under color of state law and within the scope of official duties or apparent authority.

## IV. FACTUAL ALLEGATIONS

**A. The Development Project and Funding Structure**

31. In 2019, DLK Legacy Investments LLC acquired the property located at 5128–5130 W. Center Street from the City of Milwaukee for $10,000 for the purpose of developing affordable housing and neighborhood businesses. Plaintiff Corday Alexander Linton, as the sole member and managing member of DLK Legacy Investments LLC, undertook the acquisition and development of the property.

32. The project was carried out through DLK Legacy Investments LLC as the contractual vehicle. Plaintiff was the sole member and managing member of DLK Legacy Investments LLC and personally guaranteed the project debt associated with the rehabilitation financing.

33. Plaintiff secured project financing through multiple related sources, including a Residential Rehabilitation Agreement providing $29,998 in HOME funds, a Commercial Corridor funding arrangement providing $65,523, and a $150,000 MEDC/NWSCDC loan facility. The project also included owner-financed construction costs. Project records and construction summaries reflect a total adjusted project cost of approximately $331,367.

34. Construction records further reflect owner-financed project costs including approximately $24,239 in materials and approximately $57,045 in direct contractor payments.

35. The Commercial Contract provided $65,523 from DCD's Commercial Foreclosed Property Fund for business development, with an original total project budget of $196,570.

36. Plaintiff's development project is located within the Uptown Crossing/Sherman Park Targeted Investment Neighborhood ("TIN"), an area formally designated by the City of Milwaukee for concentrated public investment and revitalization. The project site is also within the Center Street Marketplace Business Improvement District, a corridor specifically identified by the City for economic redevelopment and community stabilization. According to publicly available demographic data and the City's own planning documents, the surrounding neighborhood is approximately 71% African American, with a poverty rate of approximately 28% and a median household income of approximately $45,000. The area has experienced a population decline of approximately 23% over recent decades and is situated within a citywide housing environment characterized by an estimated shortage of approximately 63,000 affordable housing units. The City of Milwaukee, through its approval of Plaintiff's project and allocation of HOME and related funds, expressly determined that the project furthered the objectives of its HUD Consolidated Plan, including the expansion of affordable housing opportunities, neighborhood stabilization, and economic development within historically underserved communities.

37. Plaintiff's intended occupancy of one of the residential units was part of the project as approved and was not merely a speculative future business objective.

38. Plaintiff coordinated with city officials throughout the project development process. In February 2020, the Department of City Development issued formal approval letters establishing legitimate project parameters with standard commercial rehabilitation requirements and no historic preservation components (Exhibit A).

39. Architect Nicholas Robinson had previously submitted drawings to the plan check process in December 2019.

40. The plan check drawings were approved without any notation of historic designation, historic district inclusion, special preservation requirements, or property code violations (Exhibit A).

41. Based on information and belief, the property had not been designated as historical and had not completed the process necessary to be designated as historical.

42. The plan check process is specifically designed to identify all regulatory requirements including historic considerations and existing code violations. No such designations or violations were found.

43. The NIDC contract established progressive disbursement procedures under Section 4(c), 4(d), and 4(e).

44. In 2017, Plaintiff left his employment with Johnson Controls to pursue full-time real estate development, including the acquisition and rehabilitation of residential properties intended for both investment and personal occupancy. As part of the subject project at 5128–5130 West Center Street, Plaintiff planned to occupy one of the rehabilitated residential units upon completion, consistent with his development objectives and long-term housing plans. Plaintiff satisfied the applicable income-eligibility requirements for participation in the HOME Investment Partnerships Program at the time of project approval, and the residential units were specifically intended for lawful occupancy under that federally funded program. Defendants' subsequent conduct—including the imposition of unauthorized requirements, reliance on fabricated documentation, and wrongful withholding of funds—directly interfered with and ultimately prevented completion of the residential units, rendering Plaintiff's planned residence unavailable to him.

45. Section 4(e) of the NIDC contract specifically mandated that "within five (5) days after the inspection of the work, the Lender shall issue its authorization for distribution to the Borrower" unless quality standards are not met (Exhibit B). The construction manager executed disbursement statements confirming completed work eligible for reimbursement under the contract terms (Exhibit E).

46. Plaintiff alleges that the City did not disburse any funds under either the $29,998 Residential Rehabilitation Agreement or the $65,523 Commercial Corridor funding arrangement, and that no portion of those City-administered funds was ever released during the life of the project.

47. Because the City did not release project funds, Plaintiff alleges that he personally funded construction costs through personal credit cards, PayPal transactions, and direct payments to contractors. Plaintiff further alleges that no separate LLC operating account was used to fund the construction work and that the project's unreimbursed costs were carried on his personal credit.

**B. Benjamin Sanchez's Explicit Racist Statements**

48. In approximately September of 2022, during a conference call with Plaintiff, construction manager Michael Amrhein, and assistant Sherri Underwood, Defendant Sanchez began accusing Plaintiff of seeking improper duplicate reimbursement.

49. Sanchez claimed Plaintiff had submitted "fraud by asking for reimbursement from Rick Banks and Brian Pellet for the same scope items" and was "attempting to obtain double reimbursement" and "double dipping" by allegedly submitting duplicate requests for identical work items.

50. Defendant Sanchez made these accusations despite knowing they were false. Sanchez's own August 18, 2022, email acknowledged that "Rick Banks is no longer employed with the City of Milwaukee" (Exhibit C-1).

51. Plaintiff further alleges that, on August 30, 2022, Defendant Sanchez internally referenced "developing the narrative associated with the invoices received to date." Plaintiff alleges that Sanchez later used that narrative to support additional administrative demands, including asset-verification requests, and to justify withholding disbursement.

52. The stated rationale was a false pretext used to justify the discriminatory acts.

53. Rick Banks had served as Plaintiff's DCD contact for the commercial portion of the project. Because Banks was no longer employed by the City during the relevant period, Sanchez knew that any duplicate submissions to Banks were logically impossible.

54. On November 14, 2022, after Plaintiff inquired about the continued delay in disbursement of project funds, Defendant Benjamin Sanchez repeated prior accusations that Plaintiff had engaged in "double dipping," asserting during a telephone conversation that Plaintiff was "requesting reimbursement from two programs for the same expenses."

55. Defendant Sanchez relied on these allegations to initiate an administrative review and to justify withholding Plaintiff's contractually obligated reimbursement funds, despite the absence of supporting evidence and in a manner inconsistent with program requirements governing progressive disbursement of federally assisted rehabilitation funds.

56. Defendant Sanchez communicated these allegations to third parties involved in the project, resulting in harm to Plaintiff's professional reputation and credibility within the development and contracting community.

57. On November 17, 2022, Plaintiff provided documentary evidence refuting the accusations and demonstrating that his communications with former City employee Rick Banks concerned only requests for grant extensions and reporting matters, not duplicate reimbursement requests (Exhibit N). After receiving this documentation, Defendant Sanchez abandoned the prior accusations.

58. Following the failure of the alleged financial justification for withholding funds, Defendant Sanchez made a statement to Plaintiff indicating that Plaintiff "didn't deserve the money because people like you don't deserve the money."

59. When Plaintiff asked whether Defendant Sanchez meant "Black people or people from the north side of Milwaukee," Defendant Sanchez responded "both," thereby confirming that the statement referred to Plaintiff's race and geographic association.

60. The sequence of events—beginning with unsupported allegations of financial misconduct, followed by abandonment of those allegations after they were disproven, and culminating in an explicit discriminatory statement—demonstrates that the prior accusations were used as pretextual explanations for the denial of funding.

61. Defendant Sanchez thereafter continued to withhold approximately $29,998 in federally funded HOME rehabilitation funds, relying both on the altered project documentation introduced by Defendant Brian Pellett and on the previously asserted accusations of financial impropriety, notwithstanding the absence of contractual or regulatory grounds for withholding disbursement.

C. **Brian Pellett's Project-Cost Document Irregularities**

62. Plaintiff alleges that no written amendment, executed addendum, or authorized change order approved the $191,025 figure reflected in the later "Owner Development Agreement."

Plaintiff further alleges that construction manager Michael Amrhein immediately documented that he did not recall previously seeing that document and later executed a notarized statement stating that it did not reflect an agreement authorized by Plaintiff or BGI Construction Management.

63. Plaintiff alleges that Pellett later used the Owner Development Agreement to present the project as if the residential rehabilitation budget had increased from $114,900 to $191,025. On April 5, 2022, construction manager Michael Amrhein emailed Plaintiff that Pellett had delivered the document for review, that he did not recall previously seeing it, and that Pellett was requesting a signed copy before releasing funds (Exhibit F).

64. Plaintiff alleges that he was pressured to sign the document as a condition of disbursement and that the document was later used to justify a higher project-loan threshold and additional barriers to reimbursement.

65. On March 22, 2025, Amrhein executed a notarized statement stating that he had not previously seen the document and that it did not reflect an agreement authorized by Plaintiff or BGI Construction Management (Exhibit G).

**D.      Timothy Askin's Additional Historic-Preservation Requirements**

66. Plaintiff alleges that the original residential rehabilitation scope was budgeted at approximately $114,900, but the actual residential cost rose to approximately $198,333. Plaintiff attributes a substantial portion of that increase to window-related requirements and associated reconstruction work affecting carpentry, drywall, and painting throughout the second-floor residential area.

67. Plaintiff alleges that the window-related requirements affected approximately 36 upper-floor window openings and triggered associated reconstruction work, including frame rebuilding, drywall replacement, and repainting on the second floor. Plaintiff alleges that these related costs accounted for a substantial portion of the residential budget overrun.

68. Despite the 1927 building not being subject to historic preservation requirements and no historic designation appearing in approved plan drawings, defendant Askin imposed unauthorized historic requirements in September 2020 without following required procedures.

69. In September 2020, Askin required Plaintiff to use window specifications and related materials that had not been identified during the City's plan-review process. Plaintiff was not provided any written historic-designation determination, Section 106 determination, or other written basis showing that those requirements had been imposed before funding approval. Plaintiff alleges that those requirements increased project costs and delayed completion.

70. Plaintiff alleges that these requirements were imposed after project approval, were not identified during the City's plan-check process and were not accompanied by any written historic-designation determination or other written basis provided to him. Construction manager Michael Amrhein reported that Brian Pellett referred him to the Historic Preservation Commission regarding the required window specifications, and Plaintiff alleges that Askin thereafter required specific window features, including muntins and specialized materials, that increased costs beyond the approved scope.

71. Plaintiff further alleges that the resulting delays required project-extension requests and contributed to the overall residential cost overrun.

### E. Ben Sanchez's Additional Disbursement Requirements and Administrative Review Barriers

72. On August 30, 2022, Sanchez wrote that the NIDC Rental Rehabilitation loan was funded and reserved under HOME dollars and referred to "developing the narrative associated with the invoices received to date" (Exhibit C).

73. Plaintiff alleges that Sanchez then used the $191,025 figure reflected in the later Owner Development Agreement, rather than the original $114,900 residential budget, to characterize the project as having a funding gap and to demand additional documentation. On November 10, 2022, Sanchez requested asset-verification materials and documentation concerning how the supposed gap would be closed (Exhibit H).

74. On November 17, 2022, Sanchez stated that an Administrative Review Committee was waiting for additional information in connection with Plaintiff's reimbursement request (Exhibit I).

75. On November 30, 2022, Sanchez stated that NIDC would not release funds before completion of the project and referred to the contract between Plaintiff and BGI Construction Management as part of his cost calculations (Exhibit J).

76. Plaintiff alleges that these additional requirements and review barriers were not contained in the executed Residential Rehabilitation Agreement.

### F. Lisa Maney's Code Enforcement Actions

77. Plaintiff alleges that Defendant Maney issued code-enforcement directives affecting the project, including directives Plaintiff alleges contradicted the approved rehabilitation scope and concerned conditions that existed during the City's prior ownership of the property.

78. On June 13, 2019, Defendant Maney issued Order No. ORD-19-10541 identifying six exterior and structural conditions at 5128 W. Center Street, including electrical, downspout, masonry, tuckpointing, and porch-related items.

79. On September 23, 2019, after a reinspection, Defendant Maney advised that none of the listed items had been addressed. Plaintiff responded the same day that City program rules prevented construction from beginning before the necessary approvals and drawings were completed, and that he was working with City-associated personnel on those approvals.

80. On January 2, 2020, Defendant Maney wrote that reinspection fees would not be charged so long as there were updates and forward progress on the order.

81. In September 2021, Plaintiff's construction manager reported that multiple items from the 2019 violation order had been completed and that another remained pending final roofing work or permit issuance. On October 14, 2021, Defendant Maney acknowledged that only certain items remained open.

82. On March 23, 2022, Defendant Maney issued code violations requiring Plaintiff to "scrape and paint wood surfaces on exterior storefront" (Exhibit M).

83. Plaintiff further alleges that the cited conditions predated DLK Legacy Investments LLC's acquisition of the property and had existed during the City's prior ownership of the property.

84. In September 2021, Plaintiff's construction manager described the violations as having been inherited from the previous owner, the City of Milwaukee itself.

85. Complete storefront replacement had been formally approved by the Department of City Development.

86. Complete storefront replacement had been cleared through plan check review.

87. Complete storefront replacement was incorporated into the agreed-upon scope of work for both the Residential and Commercial Rehabilitation Agreements.

88. Plaintiff alleges that the directive to scrape and paint the storefront conflicted with the approved scope of work calling for complete storefront replacement and introduced additional costs during active rehabilitation.

89. Plaintiff further alleges that comprehensive searches of the City of Milwaukee's public property database revealed no publicly accessible record of Defendant Maney's enforcement actions, despite their documented existence in contemporaneous correspondence and their enforcement against Plaintiff's project. Plaintiff further alleges that other records for the same property—including garbage code violations, permits, and property registrations—were entered into the same public system during the same period, demonstrating selective exclusion rather than inadvertent omission.

90. When Plaintiff later inquired about the possibility of removing related fines, Maney stated that the fines would not be removed.

91. Plaintiff alleges that these enforcement actions increased project costs and further delayed completion while the City continued to withhold both residential and commercial funds.

**G.      Todd Miller's Ratification and Municipal Silence**

92. Plaintiff alleges that, rather than conducting an independent review, Miller redirected the matter back to the same City personnel whose actions Plaintiff had challenged.

93. On December 14, 2022, Plaintiff escalated documented evidence of discrimination to Defendant Miller in the Mayor's office (Exhibit N). Despite receiving proof refuting the false

fraud accusations and identifying specific discriminatory conduct, Miller failed to investigate. Miller's conduct — actively redirecting a civil rights complaint to the very officials accused of discrimination rather than conducting an independent investigation — constitutes affirmative ratification of the subordinates' unconstitutional conduct and establishes municipal liability under City of St. Louis v. Praprotnik, 485 U.S. 112, 127 (1988) ("[I]f the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality.").

94.     Instead, Miller referred the complaint back to the offending officials, stating he was "hoping NIDC staff will address your request in due time" (Exhibit N).

95.     This executive ratification—directing civil rights complaints to the perpetrating officials rather than conducting independent investigation—demonstrates municipal policy approval of constitutional violations under Monell v. Department of Social Services, 436 U.S. 658 (1978).

**H.      Oversight Complaints**

96.     Plaintiff later submitted complaints to City oversight channels, including a July 19, 2024 complaint to the Milwaukee Inspector General (Exhibit U), and alleges that no independent corrective action was taken.

**I.      Later Review of Project Records**

97.     Plaintiff alleges that the full chronology of the project-related communications and documents became clear only after later organization and chronological review of the project records in 2024, including the review summarized in Exhibit S.

**J.      The Interdependence of Funding Streams and Sequential Obstruction**

98. The Residential Rehabilitation Agreement required the City to disburse $29,998 in HOME funds progressively upon verified completion of work phases. The Commercial Corridor Agreement required Plaintiff to reach commercial rehabilitation milestones before triggering release of $65,523 in commercial funds.

99. Defendant Askin imposed historic preservation requirements in September 2020 that increased project costs beyond the original approved scope of $114,900 (Exhibits D, D-2, D-5).

100. Defendant Pellett delivered to construction manager Michael Amrhein a document titled "Owner Development Agreement" that increased the residential rehabilitation budget from $114,900 to $191,025 (Exhibit F). On April 5, 2022, Amrhein documented in writing: "Brian Pellet has delivered this contract for my review (I do not recall seeing this before)" (Exhibit F). On March 22, 2025, Amrhein executed a notarized statement confirming that he had never seen this document before and that it did not reflect any agreement authorized by Plaintiff or BGI Construction Management (Exhibit G).

101. On March 23, 2022, Defendant Maney issued code violations requiring Plaintiff to "scrape and paint wood surfaces on exterior storefront" (Exhibit M). The DCD-approved plans and plan-check drawings specified complete storefront replacement, not scraping and painting (Exhibit A).

102. Plaintiff expended personal capital to address the increased costs and submitted reimbursement requests supported by verified inspections and proper documentation (Exhibits E, K-1).

103. On August 30, 2022, Defendant Sanchez sent an internal email stating: "Thank you for your patience as I developed the narrative associated with the invoices received to date" (Exhibit C).

104. On November 10, 2022, Defendant Sanchez sent an email demanding that Plaintiff "provide documentation supporting how the gap in project cost is being closed" (Exhibit H). The cost figure referenced by Sanchez—$191,025—appears in the document delivered by Defendant Pellett, not in the original Residential Rehabilitation Agreement, which specified $114,900.

105. Asset verification was not required under the Residential Rehabilitation Agreement (Exhibit B). Asset verification is not required under 24 C.F.R. Part 92 or 2 C.F.R. Part 200 for progressive disbursement of HOME funds upon verified work completion.

106. On November 30, 2022, Defendant Sanchez sent an email stating: "You recently requested the Neighborhood Improvement Development Corporation (NIDC) to make an exception to our policy and release NIDC loan funds prior to all other funds being exhausted" (Exhibit J). No written policy requiring exhaustion of other funds before NIDC disbursement exists in the Residential Rehabilitation Agreement (Exhibit B), the Commercial Corridor Agreement, or applicable federal regulations.

107. In the same November 30, 2022 email, Defendant Sanchez referenced "the contract established between you and BGI Construction Management" as the basis for his cost calculations (Exhibit J). This is the document delivered by Defendant Pellett that Amrhein confirmed he had never seen before (Exhibit F).

108. In the same email, Defendant Sanchez stated: "the NIDC Administrative Review Committee will not allow an exception to release funds before the completion of the project"

(Exhibit J). The Residential Rehabilitation Agreement required progressive disbursement within five days of verified inspection, not completion of the entire project (Exhibit B, Section 4(e)).

109. Under Sanchez's November 30, 2022, directive, Plaintiff would receive no residential reimbursement funds until project completion. Without residential reimbursements totaling $29,998, Plaintiff lacked capital to continue construction toward the commercial milestones required under the Commercial Corridor Agreement.

110. Defendant Sanchez stated to Plaintiff: "People like you don't deserve the money." When Plaintiff asked whether Sanchez meant "Black people or people from the north side of Milwaukee," Sanchez responded: "both." Defendant's actions had a discriminatory intent. Further, when you compare this project to projects conducted by non-African American's, it is clear that they did not face similar acts of non-funding, required documentation with federal agencies has been properly completed to permit the release of funds, and created barriers such as designation as historical after the project was started and contracted did not exist.

111. Plaintiff's development project originally contemplated combined residential and commercial costs of approximately $311,470, and later project records reflected a total adjusted project cost of approximately $331,367. The project, intended to provide affordable housing units and community businesses in Milwaukee's north side neighborhood, ultimately failed.

112. Plaintiff was forced to sell the property at a loss (Exhibit Q-1).

**K.     Financial Impact and Validated Business Plans**

113. Plaintiff alleges that Defendants' conduct resulted in at least the following direct financial harms: withholding of $95,521 in City-administered contractual funds, a forced sale of the property for approximately $160,000 despite a substantially higher appraised value, a residential

cost overrun of approximately $83,433, substantial owner-financed project debt that remains unpaid, and approximately $164,269 in completed project work that remained unreimbursed through the third draw request.

114. As a direct result of the unauthorized contract modifications and cost increases, Plaintiff was required to provide additional financing beyond the original project scope to cover artificially created cost overruns.

115. Construction manager Michael Amrhein submitted comprehensive Payment Applications on behalf of Plaintiff, including:

(a) First transmittal letter dated May 31, 2022 with comprehensive invoices for work completed;

(b) Second transmittal letter dated August 23, 2022 after the first submission was improperly rejected by defendant Pellett;

(c) Supporting documentation including personal credit card statements, bank statements, and invoices as required by city payment processing procedures (Exhibits E, K-1).

116. The submitted applications fully complied with city requirements for payment processing documentation and CDBG documentation requirements, including "copies of all paid invoices, cancelled checks, credit card statements and/or bank statements for all of the work related to the grant" as specified in official city payment processing guidelines.

117. Among the submitted invoices were PayPal payments specifically documenting "window change order" costs necessitated by defendant Askin's unauthorized historic requirements, providing direct documentary evidence linking the imposed requirements to actual financial expenditures.

118. Professional services required to track and document the financial impact and maintain compliance with funding requirements totaled substantial costs over the project period, as documented in professional service invoices (Exhibit K).

119. Plaintiff's business plans for Dress'n Up Restaurant and the Blue Lotus commercial concept, including materials titled "The Blue Lotus Café" (Exhibit L), underwent rigorous professional evaluation by the MEDC/NWSCDC loan committee, including comprehensive financial analysis, cash flow projections, and risk assessment conducted in June–July 2020 (Exhibits L, T – Business Plans and MEDC/NWSCDC Credit Presentations).

120. Based on professional underwriting analysis, MEDC approved a $150,000 loan facility specifically secured by the proposed business operations, providing third-party validation of the economic viability of Plaintiff's business plans.

121. The delays and changed project terms eliminated Plaintiff's ability to realize planned business opportunities, as the planned commercial enterprises required operational financing during construction phases that became unavailable due to the project complications.

**L.      Additional Context Regarding Similar Experiences**

122. Plaintiff alleges that, in January and June 2025, Jennifer O'Hear of Common Ground Wisconsin referenced another developer who had been promised CDBG funds and another person with what she described as a "strikingly similar story," which Plaintiff offers as additional context suggesting his experience was not isolated (Exhibit R).

**M.      Lost Affordable Housing and Community Opportunity**

123. Plaintiff alleges that the project would have produced two affordable residential units and two planned commercial enterprises within a City-designated Targeted Investment

Neighborhood. Plaintiff further alleges that, because the project failed before completion, the two HOME-restricted residential units were never placed into service as affordable housing and the project did not generate the housing, employment, and local-business opportunities it was intended to create in that neighborhood.

**N.      Concrete Financial Harm**

124.    Plaintiff alleges that these injuries are concrete and continuing, including the realized loss from the forced sale, substantial unreimbursed completed work, ongoing owner-financed debt obligations, and the continuing financial consequences of withheld City-administered contractual funds.

125.    Plaintiff was forced to dispose of the property at a substantial loss below appraised value, as documented in broker price opinion and sales records (Exhibit Q-1).

126.    Plaintiff permanently lost the opportunity to operate the planned commercial enterprises reflected in the project materials and underwriting submissions and thereby lost the business opportunities those enterprises were intended to create. As documented in professionally validated business plans (Exhibit L) that underwent rigorous MEDC/NWSCDC loan committee evaluation including comprehensive financial analysis, cash flow projections, and risk assessment (Exhibit Q-2, Exhibit T).

127.    Plaintiff further alleges continuing financial injury from unreimbursed construction obligations, debt servicing, and related remediation costs associated with the failed project.

128.    The discriminatory conduct permanently eliminated affordable housing units from Milwaukee's community and planned businesses that would have created economic opportunities.

**O.     DCD Commercial Corridor Fund Source Uncertainty**

129.    While Plaintiff can confirm that the NIDC funds ($29,998) were federal HOME Investment Partnership Program funds (Grant M-20-MC-55-0213), Plaintiff cannot definitively confirm whether the DCD Commercial Corridor funds ($65,523) were federal or local in origin.

130.    Plaintiff confirms that the $29,998 NIDC residential rehabilitation funds were HOME Investment Partnerships Program funds. Plaintiff further alleges that the withholding of those HOME funds and the coordinated withholding of the commercial funding were part of the same course of conduct that obstructed completion of the mixed-use project and support his constitutional, Title VI, Fair Housing Act, and state-law claims.

**P. Regulatory Departures as Supporting Facts**

131.    Plaintiff alleges that Defendants' departures from normal project-review, disbursement, code-enforcement, and recordkeeping practices support his Equal Protection, Due Process, Title VI, Section 109, and Fair Housing Act claims. Plaintiff does not assert standalone causes of action based solely on the cited federal regulations or criminal statutes.

### V.     CLAIMS FOR RELIEF

### COUNT I: 42 U.S.C. § 1983 – EQUAL PROTECTION VIOLATION

### (Against All Defendants)

132.    Plaintiff realleges and incorporates by reference paragraphs 1 through 131 as though fully set forth herein.

133.    Defendants' coordinated conduct resulted in the denial of housing to Plaintiff personally, as he was prevented from occupying a residential unit within the subject property that he intended to use as his personal residence. This loss was not incidental to the project's failure but

constituted a direct and foreseeable consequence of Defendants' actions. Plaintiff was thereby deprived of a planned residential opportunity in a community with which he had longstanding personal ties, causing a distinct housing-related injury separate from purely contractual or business losses.

134. At all times relevant, Defendants acted under color of state law within the meaning of 42 U.S.C. § 1983.

135. Plaintiff alleges that Defendants treated him differently from similarly situated participants in City-administered rehabilitation programs and did so for race-based reasons.

136. Defendants' discriminatory intent and purpose are demonstrated by the following:

a. Defendant Benjamin Sanchez, the City's Housing Rehabilitation Manager, expressly told Plaintiff that he "didn't deserve the money because people like you don't deserve the money," clarifying he meant both Black people and people from Milwaukee's north side.

b. Defendants departed from written contracts, approved plans, and ordinary administrative procedures by relying on altered project-cost documentation, imposing additional window-related requirements after plan approval, and withholding disbursement through extra-contractual review and asset-verification demands.

c. Plaintiff alleges that his project was subjected to irregular treatment not ordinarily required in City-administered rehabilitation programs for non-African American's projects, including extra-contractual documentation demands, delayed disbursement, and contradictory code-enforcement directives.

d. The City and supervisory officials failed to take corrective action after receiving explicit race-based complaints, evidencing municipal approval of discriminatory conduct.

e. Defendants collectively modified and obstructed Plaintiff's residential and commercial contracts without authorization, undermining both projects.

f. Defendant Sanchez made unsupported false pretextual accusations of "double dipping," continued to rely on altered project documentation, and, after those accusations were disproven, made an explicit racial statement.

g. Defendants' conduct occurred within a Targeted Investment Neighborhood that is approximately 71% African American and was specifically identified by the City for concentrated revitalization and equitable investment. By obstructing and ultimately causing the failure of a City-approved, federally funded project designed to provide affordable housing and economic opportunity within that community, Defendants imposed a disproportionate adverse impact on African American residents. This impact, when considered alongside Defendants' explicit statements and procedural irregularities, constitutes further evidence of discriminatory intent under the framework set forth in Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252 (1977).

h. The City of Milwaukee issued code enforcement directives through Defendant Maney that contradicted DCD-approved rehabilitation plans and targeted conditions that existed throughout the City's 11-year ownership of the property but were not enforced until after Plaintiff commenced federally funded rehabilitation.

i. The City of Milwaukee owned the subject property for approximately 11 years prior to DLK Legacy Investments LLC's acquisition of the property in 2019. During the City's ownership, no code enforcement action was taken for the conditions Defendant Maney subsequently cited. On March 23, 2022, after Plaintiff had commenced federally funded rehabilitation of the property through DLK Legacy Investments LLC, Defendant Maney issued code violations for those same conditions. The violations directed Plaintiff to "scrape and paint wood surfaces on exterior storefront" (Exhibit M) at a time when the DCD-approved scope of work required complete storefront replacement (Exhibit A).

137. Plaintiff further alleges that Defendant Maney issued the original violation order in June 2019, acknowledged in January 2020 that reinspection fees would not be charged if progress continued, acknowledged partial compliance in October 2021, and then later issued additional directives in March 2022 that conflicted with the approved rehabilitation scope. Plaintiff alleges that this sequence, when viewed against the City's prior ownership and non-enforcement of the same conditions, evidences selective and irregular treatment.

138. Taken together, Defendants' use of altered project-cost documentation, additional unauthorized requirements, withholding of disbursement, and selective code-enforcement actions—combined with Defendant Sanchez's explicit racial statement—plausibly show intentional discrimination unsupported by any legitimate governmental or programmatic reason.

139. Additionally, Plaintiff was deprived his right to performance under the contracts and the privileges under the laws of the United States and the Constitution, based on retroactive enforcement of an unlawful pretextual enforcement of a historic designation. The historic designation was not mentioned or considered at the time of entering into the agreement by the parties; based on information and belief, did not exist prior to the agreement entering into the

contract; and the City knowingly and voluntarily entered into the agreement and accepted all terms and scope of the work and budget for the work to be performed. Accordingly, the historic designation was merely pretextual.

## COUNT II: VIOLATION OF TITLE VI OF THE CIVIL RIGHTS ACT OF 1964

### (42 U.S.C. § 2000d)

### (Against Defendant City of Milwaukee)

140. Plaintiff realleges and incorporates by reference paragraphs 1 through 138 as though fully set forth herein.

141. Defendant City of Milwaukee is a direct recipient of substantial federal financial assistance from the U.S. Department of Housing and Urban Development, including but not limited to:

(a) HOME Investment Partnerships Program Grant No. M-20-MC-55-0213; and

(b) Community Development Block Grant No. B-20-MC-55-0017.

142. By and through its officers, employees, and agents, the City intentionally discriminated against Plaintiff on the basis of race in the administration of these federally funded programs. Evidence of this intentional discrimination includes:

(a) racially explicit statements by City official Benjamin Sanchez;

(b) use of falsified and fraudulent documents to obstruct the release of federal funds;

(c) unauthorized contract modifications and imposition of non-existent historic requirements; and

(d) systematically different treatment of minority developers compared to similarly situated white applicants.

143. The City of Milwaukee administered these federally funded housing and community development programs through officials whom Plaintiff alleges intentionally discriminated against him on the basis of race.

144. The City's administration of the HOME and CDBG-related project funding was subject to federal nondiscrimination obligations. Plaintiff alleges that the City's departures from ordinary program administration, when combined with explicit race-based statements and the withholding of approved funds, support a plausible inference that federally assisted program benefits were denied on the basis of race.

145. As a direct and proximate result of this discrimination, Plaintiff alleges that he was denied equal access to federally funded rehabilitation benefits, including the withholding of $29,998 in HOME funds, the withholding of additional City-administered contractual funds, and the collapse of the residential and commercial project.

146. Plaintiff further alleges that Defendants' conduct deprived him of the opportunity to establish a personal residence within the subject property. Plaintiff intended to occupy one of the rehabilitated residential units in the community where he was raised, and Defendants' discriminatory obstruction caused him to lose that residential opportunity in addition to suffering economic harm. Defendant Sanchez's statement that Plaintiff did not deserve the money because he was Black and from Milwaukee's north side is alleged as direct evidence of discriminatory intent in the administration of these federally funded programs.

## COUNT III: DEPRIVATION OF PROPERTY WITHOUT DUE PROCESS OF LAW

### (42 U.S.C. § 1983)

### (Against All Defendants)

147. Plaintiff realleges and incorporates by reference paragraphs 1 through 145 as though fully set forth herein.

148. Plaintiff possessed a legitimate property interest in contractually obligated funds held in escrow under the City's residential and commercial rehabilitation contracts, totaling approximately $95,521 (consisting of $29,998 in federal HOME funds and $65,523 in DCD Commercial Corridor funds).

149. Defendants, acting under color of state law, deprived Plaintiff of that property without due process of law, in violation of the Fourteenth Amendment to the United States Constitution.

150. Defendants' deprivations occurred through a deliberate pattern of procedural misconduct, including:

    a. Conducting secret administrative proceedings and internal "review committees" using fraudulent and falsified documents;

    b. Denying Plaintiff any meaningful opportunity to contest fabricated allegations of fraud or to be heard before adverse determinations;

    c. Applying shifting and unpublished requirements inconsistent with written contracts and established CDBG procedures;

    d. Coercing Plaintiff's signature on false contract documents as a condition for releasing federal funds; and

e. Unilaterally modifying contract terms through unauthorized "historic preservation" mandates that materially altered the scope and cost of Plaintiff's projects.

151.    Plaintiff further alleges that Defendants created, circulated, and relied upon false or altered project-cost documents and false administrative narratives, including the later "Owner Development Agreement" reflecting a $191,025 residential figure and Defendant Sanchez's internally stated effort to "develop [] the narrative associated with the invoices received to date." Plaintiff alleges that those materials were used to justify asset-verification demands, internal review proceedings, and the withholding of contractually obligated disbursements.

152.    The process afforded to Plaintiff fell well below the constitutional minimums articulated in Mathews v. Eldridge, 424 U.S. 319 (1976), and subsequent precedent, as Defendants provided no notice, hearing, or impartial decision maker before depriving Plaintiff of his property interests.

153.    These due-process violations were compounded by Defendant Benjamin Sanchez's deliberate use of knowingly false fraud accusations and fraudulent documents to justify withholding funds, further demonstrating bad faith and reckless disregard of constitutional obligations.

**COUNT IV: VIOLATION OF THE FAIR HOUSING ACT (42 U.S.C. § 3617)**

**(Against All Defendants)**

154.    Plaintiff realleges and incorporates by reference paragraphs 1 through 152 as though fully set forth herein.

155. The subject property contains two residential apartment units and was financed in part through the City's HOME Investment Partnerships Program. Plaintiff alleges that the property therefore included a dwelling within the meaning of the Fair Housing Act.

156. Plaintiff developed the residential component of the project through DLK Legacy Investments LLC and intended to occupy one of the completed residential units upon completion. Plaintiff further alleges that he met the applicable program and income requirements for occupancy.

157. Defendants, acting individually and collectively under color of state law, engaged in racially motivated discriminatory conduct that interfered with Plaintiff's ability to develop, finance, complete, and occupy the residential portion of the project. Further, their actions prevented the residential dwelling from being rented to potential low-income African American tenants.

158. As a direct result of Defendants' conduct, two HOME-restricted residential units were never placed into service, Plaintiff lost the opportunity to occupy one of those units as his residence, and the supply of affordable housing intended for the surrounding neighborhood was reduced.

159. Plaintiff brings this claim both as the developer of the residential component of the project that aimed to provide housing to low-income minorities and as a prospective occupant of one of the subject residential units.

160. Defendants intentionally erected barriers to Plaintiff's housing development activities by:

a. Creating and distributing fraudulent project documents to artificially inflate costs and create pretextual justifications for withholding federal rehabilitation funds;

b. Imposing unauthorized contract modifications and "historic preservation" requirements not applied to similarly situated white developers;

c. Engaging in racially charged statements and conduct evidencing overt discriminatory animus; and

d. Withholding federally obligated HOME and CDBG funds in violation of established program procedures, thereby obstructing the development of affordable housing units.

161. Defendants have shown that they have acted differently when non-African American individuals have engaged with Defendants in similar contractual relationships without similar barriers.

162. Defendants' discriminatory acts and coordinated obstruction directly interfered with the creation of affordable housing units in a historically underserved area of Milwaukee, depriving both Plaintiff and local residents of fair and equal access to federally assisted housing opportunities.

163. These actions violated 42 U.S.C. § 3604 (b), which states: "To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, *or in the provision of services* or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin."

164. As a direct result of Defendants' conduct, two affordable residential housing units financed through the HOME Investment Partnerships Program were eliminated from Milwaukee's housing stock. Under the governing Residential Rehabilitation Agreement (Exhibit B, Section 5), these units were required to be rented to households at or below 60% of Area

Median Income ("AMI"), a threshold intended to ensure affordability for low- and moderate-income residents.

165.     The loss of these units reduced the supply of affordable housing that the project was intended to create in a neighborhood identified by the City for targeted reinvestment. The loss of these units occurred within a citywide context in which Milwaukee faces an estimated shortage of approximately 63,000 affordable housing units. Given that the surrounding neighborhood is approximately 71% African American and disproportionately impacted by poverty and housing instability, the elimination of these federally supported affordable units had a disproportionate adverse effect on African American households and undermined the Fair Housing Act's objective of expanding access to affordable housing in historically underserved communities.

166.     In addition to the loss of residential housing units, Defendants' conduct prevented the planned mixed-use project from generating the local business and neighborhood-development opportunities associated with the project's commercial component.

167.     Business-plan and underwriting materials reflected that the project was expected to support neighborhood economic activity and related employment opportunities alongside the residential units, which does not alter the application of the FHA as it relates to the discrimination towards Plaintiff to prevent his access to the provision of services for the dwellings that were provided to non-African Americans. Plaintiff alleges that Defendants' discriminatory conduct ceased those related project objectives as part of the broader goal to prevent the residential development.

168. Defendants' actions constitute unlawful interference and retaliation prohibited by 42 U.S.C. § 3617 and were undertaken with knowing disregard of Plaintiff's federally protected rights.

### COUNT V: BREACH OF CONTRACT (RESIDENTIAL REHABILITATION AGREEMENT)

### (Against Defendant City of Milwaukee)

169. Plaintiff realleges and incorporates by reference paragraphs 1 through 167 as though fully set forth herein.

170. Plaintiff, acting through DLK Legacy Investments LLC, entered into a Residential Rehabilitation Agreement with the City of Milwaukee through its Neighborhood Improvement Development Corporation (NIDC), providing $29,998 in HOME Investment Partnerships Program funds for rehabilitation of the residential units at 5128–5130 W. Center Street.

171. The Residential Rehabilitation Agreement (Exhibit B) required the City to issue progressive disbursements within five (5) days after inspection upon submission of verified invoices, lien waivers, and proof of payment. Plaintiff alleges that he complied with, or was excused from further compliance with, the contractual conditions for disbursement, including submission of payment applications, inspections, and supporting financial documentation, as demonstrated by Exhibits D, E, F, and N, including payment applications dated May 31, 2022 and August 23, 2022, inspection confirmations, and supporting financial documentation.

172. Between May 31, 2022, August 23, 2022, September 2022, November 10–17, 2022, and April 2024, Plaintiff properly requested release of HOME funds in full compliance with the Residential Agreement. The City materially breached the contract by:

(a) refusing to release eligible funds despite verified inspections;

(b) imposing unauthorized new conditions, including asset verification and administrative committee review;

(c) relying on fraudulent cost documents created by Defendant Pellett; and

(d) failing to authorize disbursement within the contractual five-day period.

These breaches caused unreimbursed construction costs, project delays, and severe financial harm.

## COUNT VI: BREACH OF CONTRACT (COMMERCIAL REHABILITATION AGREEMENT)

### (Against Defendant City of Milwaukee)

173. Plaintiff realleges and incorporates by reference paragraphs 1 through 171 as though fully set forth herein.

174. Plaintiff, acting through DLK Legacy Investments LLC, entered into a Commercial Rehabilitation Agreement with the City of Milwaukee through its Department of City Development ("DCD"), under which Plaintiff was awarded $65,523 from the City's Commercial Corridor Fund to support commercial redevelopment at 5128–5130 W. Center Street, Milwaukee, Wisconsin.

175. Plaintiff was ready, willing, and able to perform all commercial rehabilitation work contemplated under the Commercial Corridor Agreement. However, the City, acting through its agents, materially breached the Agreement by obstructing Plaintiff's ability to perform from the outset. The City imposed unauthorized historic-preservation requirements, issued contradictory code-enforcement directives through Defendant Maney that added costs to the commercial

storefront, relied on fraudulent documentation, and created fabricated administrative barriers that made performance impossible.

176. The City's prevention of commercial performance was directly caused by its wrongful withholding of residential funds. The $29,998 in HOME funds, if disbursed as contractually required, would have replenished Plaintiff's capital and enabled completion of work necessary to reach commercial milestones. By withholding residential reimbursements while simultaneously imposing additional costs through Defendant Maney's contradictory code directives, Defendants created an insurmountable financial barrier that made commercial completion impossible.

177. Because the City's own actions prevented performance, Plaintiff is deemed to have satisfied all conditions precedent under the doctrine of prevention of performance, and the City's obstruction itself constitutes a material breach. Plaintiff never received any portion of the $65,523 Commercial Corridor funds, nor was Plaintiff permitted to complete commercial rehabilitation due solely to Defendants' unlawful interference.

178. Plaintiff's readiness to perform and the City's obstruction are reflected in the payment applications, financial records, business-plan materials, underwriting records, and sale documents referenced in Exhibits K, K-1, L, Q-1, and T.

179. The City materially breached the Commercial Rehabilitation Agreement by:

a. Imposing unauthorized and unapproved historic preservation requirements that significantly altered the project scope and increased costs, without compliance with Section 106 of the National Historic Preservation Act or local procedural rules under Milwaukee Code § 320-21;

b. Using fraudulent and falsified documentation to justify denial and delay of disbursements; and

c. Failing to release contractually obligated funds in accordance with federal and municipal grant-administration standards.

180. The City's breaches occurred in bad faith and directly undermined the purpose of the agreement—to facilitate small-business revitalization in underserved areas—causing Plaintiff to sustain severe financial harm and project collapse.

181. As a direct and proximate result of the City's obstruction and prevention of performance, Plaintiff lost the entirety of the Commercial Corridor funding, lost the ability to complete commercial rehabilitation, and lost the opportunity to operate the businesses approved and validated through MEDC/NWSCDC underwriting. These damages represent loss of the benefit of the bargain and lost economic opportunity, not failure of performance by Plaintiff.

## COUNT VII: CONVERSION

### (Against Defendant City of Milwaukee)

182. Plaintiff realleges and incorporates by reference paragraphs 1 through 180 as though fully set forth herein.

183. Plaintiff pleads this claim in the alternative to his contract claims and only to the extent Wisconsin law permits a conversion claim based on specifically identifiable funds wrongfully withheld from disbursement.

184. The City of Milwaukee wrongfully exercised dominion and control over specifically earmarked and contractually obligated funds, including $29,998 in federal HOME funds and $65,523 in Commercial Corridor funds, by refusing to release or disburse those funds in bad

faith after contractual conditions were satisfied or excused by prevention of performance. These funds totaled $95,521, consisting of:

a. $29,998 in HOME Investment Partnerships Program funds designated for residential rehabilitation; and

b. $65,523 in DCD Commercial Corridor funds designated for commercial redevelopment.

185. Plaintiff alleges a contractual right to receive specifically identified funds under executed agreements requiring disbursement upon verified completion of work or upon satisfaction of conditions later excused by Defendants' own prevention of performance.

186. The City, acting through its agents and employees, intentionally withheld and retained those funds by relying on altered project-cost documentation, unsupported administrative barriers, and explanations Plaintiff alleges were false or unsupported, thereby depriving Plaintiff of property in violation of Wisconsin common law.

187. The City's actions constitute intentional conversion, as its retention and use of the funds were unauthorized, inconsistent with the terms of the governing contracts, and undertaken in bad faith.

188. As a direct and proximate result, Plaintiff suffered measurable financial injury, including loss of contractual payments, project termination, and substantial consequential damages.

### COUNT VIII: CONSPIRACY (42 U.S.C. § 1985(2))

**(Against All Defendants)**

189. Plaintiff realleges and incorporates by reference paragraphs 1 through 184 as though fully set forth herein.

190. The named defendants worked jointly with the intent to hinder, destruct, impede, and defeat Plaintiff's ability to develop his residential and commercial property, effectively operate within the contracts, and to earn the equity in his residence and the revenue from his business.

191. They have denied his equal protection under the law as he was not permitted to act where non-African American individuals were allowed to act when similar contracts were entered into.

192. Plaintiff is a member of a protected class- African American male, and he was denied the same equal rights and protections that non-African Americans enjoyed and benefited from without additional hurdles, hinderances, and impediments.

193. The parties acted united and in agreement to deny Plaintiff of his rights and privileges with a discriminatory purpose.

194. Further, plaintiff claims that the defendants violated his right under the United States Constitution to be free from deprivation of property without procedural . . . and substantive due process under the Fourteenth Amendment.

195. Additionally, Defendants' acts of impairment of contract in violation of Plaintiff rights under U.S. Const. art. I, § 10, cl. 1, and Defendants' acts of impairment of contract violated Plaintiff's rights under Ill Const. art. I, § 16.

196. Defendants joint retroactive and illegal redefinition of the property as historical after entering into the agreement with Plaintiff, in effect retroactively changed the laws around the property. Thereby, the Defendants worked in concert to use the law to prohibit Plaintiff's ability to perform the terms of the agreement, and to deny Plaintiff his right to the privileges and benefits

of the property in violation of his rights to Due Process, Equal Protection, right to be free from racial discrimination, and right to be free from depravation of property, privileges, and to contract.

197. § 1985(3) prohibits persons from conspiring "for the purpose of depriving, either directly or indirectly, any person or class of persons equal protection under the laws." 42 U.S.C. § 1985(3). The Defendants acted intentionally for the purpose of depriving Plaintiff the benefits and privileges of the contract based on his race, which based upon the review of the Plaintiff's expert the Defendants have not taken similar actions with non-African American individuals.

198. Defendants verbally expressed their intention to deny Plaintiff, an African American, his privileges and rights to contract and thereby to enhance his business and assert his constitutional right to work, to have his residence, own and maintain property, and engage in business.

199. As a direct and proximate result, Plaintiff suffered injuries including loss of income, loss and deprivation of his residence, loss of the advantages of the contract, increased debt with the interest thereof, and other consequential and compensatory damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Corday Alexander Linton respectfully requests that the Court enter judgment in his favor and against Defendants, jointly and severally where applicable, and grant the following relief:

***Declaratory Relief***

A. Declare that Defendants, acting under color of state law, violated Plaintiff's rights under the Fourteenth Amendment and 42 U.S.C. § 1983 by engaging in intentional racial discrimination, deprivation of property without due process, and related unlawful conduct.

B. Declare that the City of Milwaukee violated Title VI of the Civil Rights Act of 1964 and the Fair Housing Act by administering federally funded housing and community-development programs in a racially discriminatory manner.

C. Declare that the City of Milwaukee breached the Residential Rehabilitation Agreement and the Commercial Rehabilitation Agreement.

***Injunctive and Equitable Relief***

D. Issue such narrowly tailored injunctive relief as may be appropriate to prevent further discriminatory administration of Plaintiff's project-related rights and, if warranted, to require production of records unlawfully withheld.

E. Award such restitution, contract damages, or specific-performance relief as may be legally available under the Residential Rehabilitation Agreement and Commercial Rehabilitation Agreement, including wrongfully withheld contractual funds to the extent proven and recoverable.

***Compensatory Damages***

F. Award compensatory damages in an amount to be determined at trial, including damages for wrongfully withheld contractual funds, forced-sale and property loss, unreimbursed completed work, owner-financed project debt, lost housing opportunity, lost business opportunity, credit and reputational harm, and related consequential economic and non-medical losses proven at trial.

***Punitive Damages***

G. Award punitive damages against the individual Defendants to the extent permitted by law.

***Attorney's Fees, Costs, and Interest***

H. Award reasonable attorney's fees, costs, and expenses to the extent authorized by 42 U.S.C. § 1988, 42 U.S.C. § 3613(c)(2) and any other governing provision of law.

I. Award prejudgment and post-judgment interest as permitted by law.

***Additional and General Relief***

J. Grant such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff respectfully requests trial by jury on all issues so triable.

**EXHIBIT INDEX**

Exhibit A – February 2020 DCD approval letters and plan-check drawings

Exhibit B – NIDC Residential Rehabilitation Agreement (Section 4(e))

Exhibit C – August 30, 2022 Sanchez "narrative development" email

Exhibit C-1 – August 18, 2022 Sanchez email re: Rick Banks

Exhibit D–D5 – Historic Preservation / window requirement documents

Exhibit E – Construction manager disbursement statements

Exhibit F – April 5, 2022 Amrhein email regarding Owner Development Agreement delivered by Defendant Pellett

Exhibit G – March 22, 2025 notarized statement of Michael Amrhein regarding the Owner Development Agreement

Exhibit H – November 10, 2022 asset verification demand

Exhibit I – November 17, 2022 administrative committee email

Exhibit J – November 30, 2022 "exception to policy" email

Exhibit K – Professional services invoices

Exhibit K-1 – Payment applications and financial documentation

Exhibit L – Business plans (Dress'n Up Restaurant / Blue Lotus commercial concept, including materials titled "The Blue Lotus Café")

Exhibit M – March 23, 2022 DNS code violations

Exhibit N – December 14–15, 2022 email correspondence: (a) Plaintiff's documented rebuttal of 'double dipping' allegations with supporting evidence; (b) Plaintiff's civil rights complaint to Defendant Todd Miller in the Mayor's Office; and (c) Miller's December 15, 2022 response routing complaint to accused officials Sanchez, Pellett, and Helt

Exhibit O – Wis. Stat. § 893.80 Notice of Claim (March 16, 2025) and City Attorney Evan C. Goyke response letter (April 23, 2025) confirming receipt and assignment for internal investigation

Exhibit P – HUD Section 3 / FHEO determination (Case 824534)

Exhibit Q-1 – Broker price opinion and sale documents

Exhibit Q-2 – Comprehensive economic damages analysis

Exhibit Q-3 – Ongoing financial obligations

Exhibit R – Email correspondence between Plaintiff and Jennifer O'Hear, Lead Organizer and Executive Director, Common Ground Wisconsin (January–June 2025), regarding similar treatment of developers in City-administered CDBG programs

Exhibit S – Forensic Analysis Timeline

Exhibit T – MEDC/NWSCDC underwriting materials

Exhibit U – July 19, 2024 complaint submitted to the Milwaukee Inspector General regarding administration of Plaintiff's project

Exhibit V - City of Milwaukee Department of City Development Property Listing Sheet for 5128-5130 W. Center Street, Milwaukee, Wisconsin (confirming two second-story residential dwelling units at subject property)

Exhibit W -- City of Milwaukee Historic Land Use Investigation (HLUI) for 5128-5130 W. Center Street, Milwaukee, Wisconsin (confirming residential occupancy history and character of subject property)

Exhibit X — Draft Initial Compliance Findings Report, 5128–5130 W. Center Street, Milwaukee, prepared by Paul Barcelona, P.E., ARTOVIA (February 18, 2026) (confirming absence of Environmental Review Record under 24 C.F.R. Part 58, absence of Section 106 documentation under 36 C.F.R. Part 800, and no historic preservation information found in National Register, City Historic Designation Maps, or Wisconsin Historical Society records)

Exhibit Y — Expert Witness Qualifications of Paul Barcelona, P.E., ARTOVIA (November 18, 2025)

Exhibit Z — City of Milwaukee Targeted Investment Neighborhood Program Brochure (documenting program goals and Sherman Park TIN boundaries)

Dated: Thursday, April 30, 2026

<div style="margin-left:50%">

_____
**VERONA SWANIGAN, ESQ.**
**WSBN: 1086459**
**THE SWANIGAN FIRM**
**425 W. CAPITOL AVE STE 1533**
**LITTLE ROCK, AR 72201**
**866-603-5239**
**callthelawlady@outlook.com**
**On Behalf of CORDAY ALEXANDER LINTON**

</div>

**VERIFICATION**

I, Corday Alexander Linton, verify under penalty of perjury that on April 30, 2026, I have read this First Amended Complaint and the facts stated are true and correct to the best of my knowledge, information, and belief.

Respectfully Submitted,

_____
Corday Alexander Linton